BROWN WHITE & OSBORN LLP
THOMAS M. BROWN (Bar No. 117449)
M. K. GORDON (Bar No. 310428)
333 South Hope Street, 40th Floor
Los Angeles, California 90071
Telephone: 213.613.0500
Facsimile:213.613.0550
tbrown@brownwhitelaw.com
mkgordon@brownwhitelaw.com

WERKSMAN JACKSON & QUINN LLP
CALEB E. MASON (Bar No. 246653)
888 West Sixth Street, 4th Floor
Los Angeles, California 90017
Telephone: 213.688.0460
Facsimile: 213.624.1924
cmason@werksmanjackson.com

Attorneys for Plaintiffs
MANHATTAN BEACH FIREFIGHTERS' ASSOCIATION, *et al.*

BROWN WHITE & OSBORN LLP
ATTORNEYS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MANHATTAN BEACH FIREFIGHTERS' ASSOCIATION, LOCAL 3925, a labor association, and individuals THOMAS DESMOND, STEVEN FAIRBROTHER, JAMES FALLS, BRIAN FUJIMOTO, CHRIS GRAFTON, PETER HECK, PATRICK JACOBSON, CHRISTIAN MCARTHUR, RUDY MEJIA, JEFFREY RICE, JAMES STRATTON, and ERICK STRONG,

Plaintiffs,

v.

CITY OF MANHATTAN BEACH, a municipal corporation; individuals BRUCE MOE, LISA JENKINS; and DOES 1 through 10, inclusive,

Defendants.

Case No.: 24-4228

**COMPLAINT FOR: RETALIATION BASED ON EXERCISE OF FIRST AMENDMENT RIGHTS – 42 U.S.C. § 1983;**

[DEMAND FOR JURY TRIAL]

Plaintiffs MANHATTAN BEACH FIREFIGHTERS' ASSOCIATION, LOCAL 3925, a labor association, and individuals THOMAS DESMOND, STEVEN FAIRBROTHER, BRIAN FUJIMOTO, JAMES FALLS, CHRIS GRAFTON, PETER HECK, PATRICK JACOBSON, CHRISTIAN MCARTHUR, RUDY MEJIA, JEFFREY RICE, JAMES STRATTON, and ERICK STRONG (collectively, "Plaintiffs")[1] allege as follows:

## INTRODUCTION

1. The Manhattan Beach Fire Department ("Department") used to be one of the crown jewels of the City of Manhattan Beach ("CITY"). The Department is exceptional in that every single one of its firefighters is also a trained paramedic. Very few fire departments in the country can make this claim. For many years, the Department was a model of how to run a small fire department for the region and the state. While many other small cities in California shut down their fire departments and transitioned into large, county departments, the Department remained proof that a small city can maintain local control of a fire department while providing high-quality service and good, fair working conditions.

2. That changed drastically after Defendant BRUCE MOE became City Manager in 2018. MOE, who was previously the CITY's Finance Director, believed that the CITY could and should "save money" on future pension and benefits costs by not filling vacant Department positions and requiring the remaining personnel to work overtime. Moe's ill-conceived vision of "budget efficiency" is the epitome of the penny-wise, pound-foolish thinking of a person who has never had to work 24 hours straight, without sleep, as a first responder to emergency calls. MOE's approach, which resulted in brutal and excessive mandatory overtime for 20 firefighters who had to do the work of 30 firefighters, took a severe physical and psychological toll on Plaintiffs.

---

[1] Hereafter, "Plaintiffs" refers to all plaintiffs, collectively, while "Plaintiff Firefighters" refers collectively to the plaintiffs who are individuals.



BROWN WHITE & OSBORN LLP ATTORNEYS

3. Plaintiff Manhattan Beach Firefighter's Association ("MBFA" or the "Association") represents the firefighters who *do* respond to emergency calls every day. MBFA objected to the City's poor management of the Department, which jeopardized not only the health and safety of its firefighters, but also the health and safety of the City's residents as the coronavirus pandemic spread throughout Southern California communities. MBFA repeatedly asked the City to fill the growing list of vacant positions. With each additional retirement and injury on the job, the vacancies increased, and the remaining firefighters to work more overtime and shoulder more responsibilities. Morale in the Department deteriorated as a dwindling number of firefighters had to work a crushing number of overtime hours to protect the health and welfare of Manhattan Beach residents.

4. After years of struggling with these issues, MBFA and Plaintiff Firefighters began to speak out publicly about the troubling situation. However, MOE and his allies, including the CITY's previous and current Human Resources Directors Teresia Zadroga-Haase ("Zadroga") and LISA JENKINS, respectively, had all the power, and they used it to retaliate against and punish the Association and its members for daring to expose the City's mismanagement of the Department to the public.

5. MOE and the CITY viewed MBFA's and Plaintiff Firefighter's public statements as a challenge to their authority. Instead of listening to Plaintiffs' legitimate concerns regarding the Department's needs to maintain public safety, MOE lashed out at them: He accused the firefighters of being overpaid and entitled. He supported that falsity with annual pay figures that were inflated due to the excessive, unsustainable, mandatory overtime hours the CITY itself had created by dangerously understaffing the Department. MOE repeatedly publicly criticized Plaintiffs after exercising their First Amendment speech rights for being the "highest paid" firefighters in the state to distract the public from the City's gross mismanagement of the Department.

6. Meanwhile, the firefighters became the most *overworked* firefighters in California. From March 2018 to June 2022, the City and its HR Directors refused to fill



BROWN WHITE & OSBORN LLP
ATTORNEYS

*nine* vacancies in a lean department that had only 29 positions to begin with, not including the fire chief.[2] During that time and even through the end of 2023, the number of overtime hours the remaining firefighters worked increased dramatically.

7. The CITY continued to retaliate against the firefighters and the Association for their public statements in many ways:

a) The CITY unilaterally and capriciously manipulated the promotional process for three vacant battalion chief positions to ensure that vocal firefighters, including MBFA leadership, would not be promoted.

b) The CITY refused to negotiate in good faith with the Association over the expiring labor agreement.

c) The CITY initiated baseless, retaliatory disciplinary investigations against MBFA leadership.

d) Finally, the CITY's retaliation campaign culminated in the fall of 2022 when it voted to impose unfair labor terms upon the City's firefighters without their consent. The imposed contract subjected Plaintiffs to onerous and arbitrary conditions not imposed on other CITY workers, and that serve no purpose but to punish MBFA members.

8. Defendants MOE, JENKINS, and the CITY took these steps to (1) break the Association and intimidate it and its members into silence and submission (in other words, to force them to abandon the exercise of their First Amendment rights); (2) retaliate against MBFA and its leadership for lawful negotiating and organizing activities; and (3) to retaliate against and silence individual firefighters' constitutionally protected speech as citizens on matters of public concern. A government's repeated and dangerous mismanagement of emergency services is always a topic of great concern to the public, especially in the throes of a global

[2] The City's imposed contract reduced that number to 24.

pandemic. By their conduct, Defendants stifled the constitutional rights of the firefighters and endangered Manhattan Beach residents.

9. The CITY's actions were illegal, and Plaintiffs are entitled to redress. Our Constitution protects the rights of all Americans to join associations, to negotiate labor agreements, and to speak out publicly as citizens on matters of public concern. This right is particularly important to protect when that speech happens to criticize or disagree with the government or its officials. Our Constitution does not permit a public employer to retaliate against its employees for exercising their First Amendment rights and to subject them to retaliation. That is precisely what the CITY and its officials did here.

## JURISDICTION AND VENUE

10. Plaintiffs bring this lawsuit under the United States Constitution and 42 U.S.C. § 1983. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

11. The acts alleged herein occurred in the Central District of California. Therefore, venue lies in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391.

## PARTIES

12. Defendant CITY OF MANHATTAN BEACH ("CITY") is a municipal corporation, operating as a general law city under the "council-manager" form of government, and organized under the Constitution and laws of the State of California. The CITY's principal place of business is in this judicial district located at 1400 Highland Avenue, Manhattan Beach, California. The CITY has a fire department ("Department") comprising both management and non-management level employees.

13. Plaintiff MANHATTAN BEACH FIREFIGHTER'S ASSOCIATION ("MBFA" or "ASSOCIATION") is an association that represents the Department's non-management sworn personnel. MBFA is the "recognized employee organization," as that term is used in California Government Code section 3501, subdivision (b), for the CITY's sworn fire department personnel, including the classifications of

BROWN WHITE & OSBORN LLP
ATTORNEYS

firefighter-paramedic, engineer-paramedic, captain-paramedic, fire marshal, and fire inspector and excluding the Department's management employees, i.e., the fire chief and battalion chiefs ("Management Staff"). The primary functions of MBFA are to represent its members, the non-management sworn personnel, in their relations with the Department and the CITY, including any issues relating to pay, benefits, working conditions, or discipline; to negotiate contracts with the CITY regarding pay, benefits, and working conditions for its members; to advocate for public safety policies with local, state, and federal officials; to support outreach and public-service programs relating to public safety; and to support, assist, and advocate for its members, retirees, and their families, with respect to any issues relating to their employment.

14. Plaintiff THOMAS DESMOND ("DESMOND") is and, at all times mentioned herein, was an MBFA member, a Manhattan Beach fire captain and paramedic, and a resident of the State of California. DESMOND was on the MBFA executive board from 2017 to 2019.

15. Plaintiff STEVEN FAIRBROTHER ("FAIRBROTHER") is and, at all times mentioned herein, was an MBFA member, Manhattan Beach firefighter and paramedic, and resident of the State of California. FAIRBROTHER was on the MBFA executive board in 2011-2013 and 2019-2020.

16. Plaintiff JAMES FALLS ("FALLS") is and, at all times mentioned herein, was an MBFA member, Manhattan Beach firefighter and paramedic, and resident of the State of California. FALLS is on the MBFA executive board.

17. Plaintiff BRIAN FUJIMOTO ("FUJIMOTO") is and, at all times mentioned herein, was an MBFA member, Manhattan Beach firefighter and paramedic, and resident of the State of California.

18. Plaintiff CHRIS GRAFTON ("GRAFTON") is and, at all times mentioned herein, was an MBFA member, Manhattan Beach firefighter and paramedic, and resident of the State of California. GRAFTON is on the MBFA executive board.

19. Plaintiff PETER HECK ("HECK") is and, at all times mentioned herein, was an MBFA member, Manhattan Beach firefighter and paramedic, and resident of the State of California. He has been MBFA's President since January 2024 and on its executive board since 2020.

20. Plaintiff PATRICK JACOBSON ("JACOBSON") is and, at all times mentioned herein, was an MBFA member, Manhattan Beach firefighter and paramedic, and resident of the State of California. JACOBSON was on the MBFA executive board from 2021 to 2023.

21. Plaintiff CHRISTIAN MCARTHUR ("MCARTHUR") is and, at all times mentioned herein, was an MBFA member, Manhattan Beach firefighter and paramedic, and resident of the State of California. MCARTHUR is on the MBFA executive board.

22. Plaintiff RUDY MEJIA ("MEJIA") is and, at all times mentioned herein, was an MBFA member, Manhattan Beach firefighter and paramedic, and resident of the State of California. MEJIA was MBFA President from 2011 to 2023.

23. Plaintiff JEFFREY RICE ("RICE") is and, at all times mentioned herein, was an MBFA member, Manhattan Beach firefighter and paramedic, and resident of the State of California. : RICE was on the MBFA executive board from 2019-2020.

24. Plaintiff JAMES STRATTON ("STRATTON") is and, at all times mentioned herein, was an MBFA member, Manhattan Beach firefighter and paramedic, and resident of the State of California.

25. Plaintiff ERICK STRONG ("STRONG") is and, at all times mentioned herein, was an MBFA member, Manhattan Beach firefighter and paramedic, and resident of the State of California.

26. Defendant BRUCE MOE ("MOE") is and was employed as the CITY's City Manager at all relevant times mentioned herein. The CITY vested MOE with the power and authority to make and approve the CITY's policies and decisions relating to the Department. MOE is a resident of the State of California. Plaintiffs sue MOE in both his individual and official capacities.

BROWN WHITE & OSBORN LLP
ATTORNEYS

27. Defendant LISA JENKINS ("JENKINS") is and was employed as the CITY's Director of Human Resources at all relevant times mentioned herein after January 1, 2019. The CITY vested JENKINS with the power and authority to make and approve CITY policies and make or approve decisions relating to hiring, discipline, and promotions in the Department. JENKINS is a resident of the State of California. Plaintiffs sue JENKINS in both her individual and official capacities.

28. Defendants will be referred to individually by name or collectively as "Defendants."

29. Plaintiff Firefighters are informed and believe and thereon allege that actions or failures to act, taken by and through the CITY's designated employees and agents were committed within the purpose and scope of their employment or relationship with the CITY and in their official capacity as the CITY's employees and that the CITY is legally responsible for all such acts or omissions.

30. Plaintiff Firefighters do not know the true names and capacities of DOES 1 through 10, inclusive, and thus sue said Defendants by fictitious names. Plaintiff Firefighters will identify the true names and capacities of DOES 1 through 10, inclusive, if and when they are ascertained. Plaintiff Firefighters are and believe that each of the fictitiously named Defendants is in some manner legally responsible for the occurrences alleged herein.

31. Plaintiff Firefighters are informed and believe that Defendants, and each of them, were the agents, employees, servants, and/or co-conspirators of the other Defendants at all times mentioned herein. Plaintiff Firefighters are further informed and believe that Defendants, and each of them, were the actual and/or ostensible agents of the other Defendants and were acting within the course and scope of said agency.

//

//

BROWN WHITE & OSBORN LLP
ATTORNEYS

BROWN WHITE & OSBORN LLP ATTORNEYS

## ALLEGATIONS COMMON TO THE CLAIM FOR RELIEF

### I.

### FIREFIGHTERS EARNESTLY COOPERATE WITH CITY TO IMPROVE DEPARTMENT MANAGEMENT

32. The CITY is a municipality of approximately 35,000 residents and is situated in the Los Angeles metropolitan area, in western Los Angeles County. Most cities of comparable size in the county contract with the county for provision of fire services. Some cities, like the CITY, have maintained independent fire departments. Plaintiff Firefighters are proud to be firefighters and proud to serve their community. They have always made the most of the resources available to provide lifesaving services to Manhattan Beach residents.

33. The CITY operates under the "councilmember" form of government with a city council of five members, who each serve a nine-month mayoral position during their four-year terms.

34. From 2011 to 2018, Robert Espinosa was fire chief and Mark Danage was the CITY's City Manager. During that period, due to MBFA members' many complaints of mismanagement and incompetence against Espinosa and Battalion Chiefs Ron Laursen, Michael Boyd, and Scott Hafdell (collectively, "Espinosa's Battalion Chiefs"), Mr. Danaj hired a number of consultants and "coaches" to improve the situation. Based on evidence that Management Staff's conduct and decision-making continued to be problematic, Mr. Danaj asked Espinosa to resign. Espinosa announced his retirement for the end of 2017.

### II.

### THE CITY CAUSES STAFFING ISSUES, LEADING TO FIREFIGHTERS' VOTE OF NO CONFIDENCE

35. In January 2018, the CITY terminated then-City Manager Mr. Danaj, alleging that he was "overspending" on City services. The CITY hired its Finance Director BRUCE MOE as City Manager, who promptly reinstated Espinosa. Under

MOE's reign, Plaintiff Firefighters' working conditions and Department operations began to deteriorate rapidly.

36. MOE decided it was cheaper to overwork existing Department employees and pay overtime than to fill vacant Department positions and incur pension and benefits costs. Therefore, MOE adopted the policy of not hiring to fill vacancies, not promoting Department employees to fill vacancies, and forcing the remaining Department employees to work more to make up for the shortage of first responder personnel. HR Directors Zadroga and JENKINS adopted and implemented that policy as well.

37. MOE's utter disregard for Plaintiff Firefighters' concerns regarding mismanagement of the Department and the negative impact of his policies on emergency services deeply alarmed them. All fire captains who were filling in as acting battalion chiefs at the time resigned from their positions in protest, to emphasize the gravity of their objections to MOE's decisions and their dangerous impact on emergency services to the public. MBFA also held an internal Vote of No Confidence ("Vote of No Confidence") regarding then-chief Robert Espinosa, and 84% of MBFA members who voted stated they had "no confidence" in Espinosa and Espinosa's Battalion Chiefs, who were carrying out MOE's directives.

38. MBFA believed that Espinosa was blindly implementing MOE's policy of deliberately understaffing the Department, forcing the firefighters to work an undesirable number of mandatory overtime, and not supporting them despite their pleas for better staffing and more reasonable hours. All Plaintiff Firefighters except JACOBSON, who abstained from voting because he was new to the Department at the time, supported the Vote of No Confidence.

39. MOE and his allies in the CITY considered the firefighters' actions as a challenge to their authority and power. They ignored the Vote of No Confidence and retaliated against Plaintiff Firefighters and MBFA by initiating a frivolous disciplinary investigation of MBFA leadership, including the MBFA president at the time, MEJIA.



BROWN WHITE & OSBORN LLP
ATTORNEYS

The purported reasons for the discipline were pretextual; the real purpose of the investigation and ensuing report was simply to retaliate against any MBFA members who challenged the CITY by tarnishing their employment files. The CITY sought to silence Plaintiffs and prevent them from exercising their constitutional rights.

40. In February 2018, MOE and the CITY prevented fire captains from returning to their posts as acting battalion chiefs, which made it impossible for the Department to consistently staff the battalion chief rank during shifts. It is imperative that a fire department have a battalion chief on duty at all times for any major emergency, as well as to run and manage the department day-to-day. The CITY deprived the Department of the management and supervision it needed to operate and provide emergency services to the City.

41. Due to Defendants' failures and mishandling of the Department, which were getting worse and not better, MBFA and its members made the difficult decision to publicly announce the Vote of No Confidence at a council meeting in March 2018. At that meeting, MEJIA explained, "the reason we're moving forward publicly now is because [Espinosa] and the [CITY] have broken their promise for the chief to retire on December 23rd. Firefighters waited patiently and worked with the [CITY], staff and council … [Espinosa's retirement date] was rescinded, [so] we're moving forward because it's now affecting public service in a negative way."

42. The Vote of No Confidence reads, in relevant part, as follows:

> The overwhelming majority of our membership believes that the actions and inactions of Chief Espinosa have led to deterioration in working conditions that has negatively impacted emergency response services for our firefighters and the community we serve. Chief Espinosa's harmful leadership approach has come at a cost to the membership, department, and the continuing legacy, pride, and traditions that Manhattan Beach firefighters have maintained for 94 years.
>
> Since his appointment as Chief, Chief Espinosa has destroyed the morale of the firefighters in this Department; alienated our sister




BROWN WHITE & OSBORN LLP ATTORNEYS

> agencies; undermined professional readiness and training; threatened and antagonized those of us who sought in good faith to work with him; and misused the disciplinary process to retaliate against and intimidate those who question his decisions. Recently, the Chief's leadership approach has been adopted by his Command Staff, leading to a contentious relationship filled with mistrust, vindictiveness and grievances, which are highly uncharacteristic of the MBFD.
>
> …
>
> The members of the Association do not take this action lightly and do so now only after numerous good-faith efforts over the past five years to address their concerns with Chief Espinosa and after reaching out to City management for the last one-and-a-half years. These efforts included full cooperation with three different eadership/communication coaches provided by the City at significant expense to the taxpayers. After much effort to try to resolve these issues internally and informally, the Association believes that its concerns have fallen on deaf ears.
>
> …
>
> In closing, our members continue to respect the position of Fire Chief in an operational capacity, but not the person currently appointed to it.

43. Additionally, the Vote of No Confidence gave the following examples of Management Staff's conduct and failings that led to the vote:

a) Initiating costly and inefficient programs and studies that led to no tangible results, recommendations, or implementations, including an inefficient $225,000 ambulance program, an expensive new record management system that was never implemented, and a $100,000 "study" of the Hermosa Beach Fire Department;

b) Use of threats, intimidation, and coercion to retaliate against the Department employees who questioned Espinosa's decisions, such as by pushing individuals to retire and wasting CITY funds on frivolous investigations and

complaints against MBFA members, which in turn led to exorbitant legal fees for both the CITY and MBFA;

c) Placing firefighters at risk by interfering in worker's compensation procedures and directly pressuring firefighters' physicians to approve injured firefighters for work;

d) Deliberately attempting to eliminate fire captains' inter-communication, influence, and input on planning, operations, and promotional decision-making, to the detriment of the Department and community safety. Espinosa repeatedly interfered with fire captains' training and supervision of their crews, which undermined the authority of his staff and ultimately impaired firefighter readiness.

e) Decreasing the Department's operational preparedness by destroying relationships with partners like the LA County Lifeguards (the "Lifeguards") and Area G Training Group. Espinosa prohibited MBFA members from engaging in training or assisting in water rescues on beaches in collaboration with the "Lifeguards," which decreases the availability, robustness, and preparedness of emergency response services to the community. His poor leadership caused the disbandment of the joint committee with Area G Training Group, severely impairing inter-agency cooperation in maintaining public safety.

f) Pitting MBFA members against one another and instigating infighting, damaging trust relationships between Department employees—a vital ingredient when working together in the types of emergent crises and high-risk situations firefighters confront regularly.

44. Then-MBFA President MEJIA, with the support of MBFA executive board members John Dulmage, Timothy O'Brien, David Shenbaum, and THOMAS DESMOND, and the vast majority of the MBFA membership publicly delivered the Vote of No Confidence to the CITY, Espinosa, and Espinosa's Battalion Chiefs on March 6, 2018. Espinosa retired the following month.

45. After the Vote of No Confidence and Espinosa's retirement, Plaintiffs hoped for better communication, accountability, and management from the CITY, especially the HR Director and Management Staff. Instead, Defendants continued to mismanage the Department and aggressively retaliated against Plaintiffs for exercising their constitutionally protected rights to associate and bargain as an association, engage in political activity, and speak publicly about matters of public concern.

## III.

## DEFENDANTS RETALIATE FOR THE VOTE OF NO CONFIDENCE, AND MISMANAGEMENT OF THE DEPARTMENT WORSENS IN 2018-2021

### A. Defendants' Retaliation Against Plaintiffs and Further Mismanagement of the Department from April 2018 to October 2020

46. The Vote of No Confidence was Plaintiffs' first public statement regarding Defendants' mismanagement of the Department and its negative impact on public safety. Following the Vote of No Confidence, Defendants engaged in numerous acts intended to retaliate against Plaintiffs for ASSOCIATION activities and their public statements about Department staffing, operations, and management. For example, the CITY's refusal to fill vacancies became even more extreme, leading to astronomical mandatory overtime hours for Plaintiff Firefighters.

47. Any reasonable employee in Plaintiff Firefighters' positions would have found Defendants' adverse employment actions materially adverse in that Defendants' actions would have dissuaded a reasonable employee and did dissuade Plaintiffs from engaging in the protected activities at issue: Association activities and public speech on matters of public concern. Examples of Defendants' retaliation are as follows.

48. The CITY retaliated against Plaintiffs for the Vote of No Confidence by refusing to approve training days and by preventing them from receiving compensation for approved training classes. This retaliation was conducted by Espinosa's Battalion Chiefs, in retaliation for the Vote of No Confidence, and the CITY did nothing to





BROWN WHITE & OSBORN LLP ATTORNEYS

investigate, ameliorate, or impose discipline for the complaints against Espinosa's Battalion Chiefs, including the misconduct and mismanagement described in the Vote of No Confidence. The CITY did nothing to investigate, ameliorate or prevent the retaliatory acts of Espinosa's Battalion Chiefs. By ignoring their conduct and failing to take any steps to investigate it, the CITY ratified, and continues to ratify, the retaliation.

49. The CITY initiated frivolous disciplinary investigations against MBFA leadership and vocal MBFA members, including Plaintiff Firefighters, for no purpose other than to sully Plaintiff Firefighters' employment records, inhibiting their ability to promote or transfer to other fire departments, and tarnishing their reputations.

50. Defendants prevented MBFA members who were filling in as "acting" battalion chiefs to return to those positions by surreptitiously modifying the education or training requirements for them to do so. This made it difficult for the Department to ensure it always had a battalion chief on duty, which is crucial in the event of a major emergency and also necessary for day-to-day operation of the Department.

51. Meanwhile, MOE and the CITY failed to hire a permanent fire chief for more than a year, forcing the Department to operate from April 2018 to April 2019 with essentially no guidance, supervision, or leadership from a committed and invested fire chief. When Defendants did finally hire a permanent fire chief, Daryn Drum, in April 2019, Chief Drum began the process of improving management of the Department. Defendants did not like this: The CITY explicitly told Chief Drum that he was "too close" to MBFA and its members and terminated him after only 14 months in June 2020, one of the deadliest junctures of the coronavirus pandemic. This destabilized an already struggling Department even more. It forced the people who were providing emergency services during a pandemic-induced, nation-wide state of emergency to endure another two years with another interim chief, while Defendants worked comfortably from home by Zoom.

52. Defendants knew an interim chief would have little leverage to challenge the CITY's policies and agenda and would be less able to advocate for MBFA or its members. After the firing of Chief Drum, Wolfgang Knabe became interim chief. The Department then was without a permanent chief for another *two years* so that they could freely conduct their plan of retaliation against the firefighters. MOE and the JENKINS continued to exert their power over the Department and Defendants' retaliation only worsened.

53. In 2019, MOE and the CITY retaliated against Plaintiffs by refusing to negotiate reasonably with MBFA or to make reasonable concessions with respect to their labor contract. Due to Defendants' dangerous policy of not filling first responder vacancies in the Department, the firefighters were forced to work many overtime hours, which was reflected in their reported earnings. Defendants used and mischaracterized that data to accuse the firefighters of being "overpaid" and greedy, despite the fact that this had been MOE's and the CITY's goal all along—save money by understaffing the Department. A fire department cannot operate safely with less than a full staff for each shift, but MOE intentionally refused to hire enough firefighters to fully staff each shift.

54. After the Vote of No Confidence, the CITY retaliated against Plaintiffs' exercise of their First Amendment rights by taking an even more extreme position against filling vacancies in the Department to fill vacancies or promote internal candidates to fill vacancies in the Department, which quickly increased and caused Plaintiff Firefighters to shoulder an overwhelming number of overtime hours. MOE and the CITY forced the dwindling number of Department employees to endure a crushing burden of unrelenting overtime, which *increased* as the COVID pandemic began ramping up, putting the safety and welfare of firefighters and citizens at risk.

55. That mandatory overtime eroded firefighters' physical and mental health, as Defendants knew it would and intended it as retaliation for Plaintiffs' association activities and speaking out against the CITY's mismanagement of the Department.




BROWN WHITE & OSBORN LLP
ATTORNEYS

Defendants continued to use the skewed salaries engendered by excessive overtime hours as an excuse for their refusal to negotiate reasonably or make *any* concessions at all. For example, the CITY refused to agree to a modest cost-of-living adjustment of 3% over 3 years while simultaneously granting it in contracts with *every other bargaining unit* in the CITY, including the Manhattan Beach Police Officers' Association ("MBPOA"). Because of the CITY's retaliatory refusal to negotiate over the course of an entire year, in December 2019, MBFA was forced to agree to a "zero-sum" extension of the previous contract and no cost-of-living adjustment at all while other CITY employees received one.

56. Defendants' retaliatory acts forced MBFA to expend time, energy, and money to file several complaints with California's Public Employment Relations Board ("Board"). Plaintiffs thereby exercised their constitutional rights to associate, bargain collectively, and petition the government. The Board ruled in MBFA's favor in 2019—strong and persuasive evidence of how unreasonable, unfair, and negligent Defendants' acts were. This decision only caused Defendants to continue and increase their retaliation against Plaintiff Firefighters and MBFA for exercising their constitutional rights to associate and bargain collectively, as follows.

**B. <u>Defendants Retaliate Against Plaintiffs Further by Slashing Battalion Chiefs' Compensation, Preventing Promotions, Refusing to Fill Mounting Vacancies, and Causing Crushing Overtime Hours</u>**

57. In Fall 2020, Espinosa's Battalion Chiefs were near retirement, which meant that a few of the MBFA leaders and members who had been most active and vocal in challenging the CITY and Management Staff's mismanagement of the Department would receive promotions to battalion chiefs in the near future: Shenbaum, O'Brien, DESMOND, and Dulmage.[3] Additionally, such promotions would have a

[3] Shenbaum and O'Brien filed a lawsuit November 2022 against the CITY for its unlawful retaliatory acts, entitled David Shenbaum and Timothy O'Brien v. City of Manhattan Beach (Case No. 2:22-cv-08062-SB-PD), including those described herein.



BROWN WHITE & OSBORN LLP
ATTORNEYS

trickle-down effect, given the small size of the Department: Promotions at the top would lead to promotions of several Plaintiff Firefighters at lower ranks. Defendants took extraordinary and retaliatory actions to prevent this from occurring. MOE and JENKINS moved quickly to block MBFA leadership and Plaintiff Firefighters from receiving the battalion chief positions or any other promotion.

58. The Manhattan Beach Fire Management Association ("MBFMA") is the association that represents the three battalion chiefs in the Department. MBFMA represents battalion chiefs in relations with the CITY including pay, benefits, working conditions, and discipline. In October and November 2020, despite protests from MBFA, the CITY ratified new labor contract terms with MBFMA, slashing battalion chief's employee compensation and benefits in order to harm the firefighters for exercising their constitutional rights. The new contract did the following:

a) Eliminated 15% pay incentive for education and longevity;

b) Eliminated 2.5% merit bonus;

c) Eliminated the $200/month vehicle allowance;

d) Eliminated almost all overtime pay; and

e) Increased employee's contribution to retirement by 3%.

59. Espinosa's Battalion Chiefs were close to retirement and eagerly supported the CITY's retaliation against the MBFA members who had backed and publicized the Vote of No Confidence against them. Most of the cuts applied only to *new* battalion chiefs, and *not* to Espinosa's Battalion Chiefs, who received a retroactive 10-month raise to compensate them for any cuts that would apply to them during the short period remaining before their retirement.

60. Defendants' cuts to battalion chiefs' compensation and benefits ensured that any MBFA member who became a battalion chief would suffer an immediate reduction in pay of 15% or greater. The CITY's goal was to deter internal firefighter candidates from pursuing the position, since they would receive a pay reduction after a promotion. The CITY insisted upon these terms to prevent MBFA leadership from




BROWN WHITE & OSBORN LLP ATTORNEYS

being promoted to these positions, as they otherwise would have been, given their qualifications and experience. The CITY preventing internal battalion chief promotions also prevented Plaintiff Firefighters at lower ranks who had exercised their First Amendment rights with respect to the CITY's mismanagement of the Department from receiving promotions that would have followed.

61. As Defendants had planned, after the above-mentioned contract term was enacted, Espinosa's Battalion Chiefs took their retroactive raises and promptly left the Department: The following month, Boyd retired and Laursen went on injury leave, never to return. Three months later, Hafdell also went on injury leave, never to return. With Firefighter-Paramedic Matthew Simkins's retirement in November 2020, this led to four vacancies in the Department, including the two battalion chief positions. This shortage required MBFA members to cover approximately 240 overtime hours weekly, in addition to each firefighter's regular 56 hours each week.[4]

62. Defendants also increased the education qualifications for the battalion chief position for retaliatory reasons by requiring that all future battalion chiefs possess a bachelor's degree. Defendants targeted this retaliatory requirement at MBFA leaders Shenbaum and Dulmage, who had been the top-banded candidates for promotion and did not have bachelor's degrees. This requirement was retaliatory, arbitrary, and had no rational justification. It has no basis in industry standards or historical practices. It was a rule conceived to target and retaliate against MBFA leaders.

//

//

[4] While this averages to approximately 11 overtime hours per MBFA member, in reality overtime hours are not distributed evenly amongst firefighters due to the differences of vacancies per rank, the relative importance of certain positions being filled as opposed to others, and the limited number of Department employees who are qualified and available to serve in "acting" capacities for a given position. Moreover, firefighters' shifts are generally in 24-hour blocks, not 11 hours. In other words, the firefighters working overtime shifts are working an extra 24, 48, or even 72 hours per week.



BROWN WHITE & OSBORN LLP ATTORNEYS

**C. Defendants' Retaliation Against Plaintiffs Continues to Cause Understaffing, Insufficient Supervision, and Crushing Overtime Hours in December 2020 to December 2021**

63. MOE and the JENKINS continued to retaliate against Plaintiff Firefighters and MBFA for their association activities and the Vote of No Confidence by refusing to fill vacancies even when the Department was more than 25% understaffed. The firefighters' already-high overtime hours rose to dangerously high levels, persisting for years, causing them continuing physical and psychological harm and risking the safety and welfare of the community.[5] This was not merely mismanagement of the Department jeopardizing public health and safety; it was ***deliberate and intentional*** mismanagement motivated by retaliation against Plaintiffs for their protected speech.

64. Despite repeated requests in 2021, MOE and JENKINS refused to rectify their retaliatory and substantial cuts to the battalion chief compensation package, which was reduced below that of the lower ranked captains who were qualified for the position. Thus, the battalion chief positions remained unfilled.

65. For three months in 2020, the Department had only one active battalion chief, and then none for *two years* until February 2022. Defendants' retaliation caused this unsafe situation, which was extraordinary, unprecedented, and inimical to public safety. There was no public policy justification for it; it was pure vindictiveness directed at the MBFA by Defendants.

66. It is against standard emergency response staffing procedure, best practices, and policies and inconsistent with public safety imperatives for a fire department to operate without a battalion chief on duty. There are situations in which firefighters cannot respond to an emergency situation without one, not to mention the

[5] The excessive number of overtime hours has modestly abated only recently for some MBFA members as of the filing date of this complaint.



BROWN WHITE & OSBORN LLP ATTORNEYS

central role of a battalion chief in day-to-day operations of the Department. Nevertheless, Defendants forced the firefighters to operate through most of the COVID pandemic without a fire chief or a single battalion chief. This was part of the CITY's retaliatory and retributive agenda against the firefighters for exercising their constitutional right to organize an function as an association and publicly voice their concerns about Defendants' mismanagement of the Department. Defendants even impaired the Department's ability to have qualified MBFA members fill in as acting battalion chief by arbitrarily increasing the education requirement, as noted above, and even training requirements, so that Shenbaum, Dulmage, and Wade could not fill in or promote into the positions.

67. As a consequence, the Department frequently went without a battalion chief at all. MBFA members were then required to fill in as acting battalion chiefs (and acting captains) with added overtime and responsibilities, but without the financial benefits of an actual promotion.[6] Firefighters took on this added responsibility willingly because it was necessary to provide emergency response services to the public.

68. Since the Department has only 29 firefighters, not including the chief, four vacancies are a 14% reduction in personnel, which was the situation at the beginning of 2021. Additionally, only certain firefighters are qualified to serve as acting battalion chiefs. After blocking and deterring internal candidates, the CITY made no attempt to hire any new battalion chiefs. This retaliation caused 26 firefighters to work overtime to cover three additional unfilled positions for every shift in addition to their own full-time workloads.[7]

---

[6] MBFA members who serve as acting battalion chiefs, captains, and/or fire engineers receive a nominal $175 a month regardless of how many shifts or ranks a month they filled in an acting capacity.

[7] The Department frequently went without a battalion chief on duty.





BROWN WHITE & OSBORN LLP ATTORNEYS

69. In February 2021, the Department had six vacancies and no active battalion chiefs, which translates to approximately 360 hours or more of overtime *per week* that the remaining Department employees had to cover. With COVID pandemic-related fatalities and hospitalizations at record highs, the Department was only 80% staffed because of Defendants' retaliation.

70. In summer 2021, Department vacancies rose from four to seven to nine, meaning the Department was 30% understaffed. This resulted in 21 firefighters covering approximately 540 hours of *overtime* per week to cover the vacancies. This is an average of 25 hours per week of overtime for each firefighter. Since firefighters typically work 24-hour shifts, this meant that each active firefighter had to work an additional 24-hour shift *every week* and at least some had to work *two* overtime shifts every week, in addition to the 56 hours of their regular, full-time weekly schedule.

71. As of December 2021, the Department still had 5 vacancies and still no battalion chiefs, requiring firefighters to work an additional 300 hours of overtime. On average, this meant that at least 12 firefighters had to work an additional 24-hour overtime shift *every week*. However, only certain firefighters were qualified to work as acting battalion chiefs, and events such as sickness, emergencies, and injury further limited the available personnel. Therefore, certain firefighters worked many more overtime hours than others to ensure that the Department was prepared at all times to keep Manhattan Beach residents safe.

72. Defendants' retaliatory and knowing imposition of grueling overtime resulted in an enormous number of hours on duty for Plaintiff Firefighters, who were unable to go home or see their families during a time when children were required to stay at home and parents needed their partners more than ever. It is simply unsustainable physically, psychologically, and emotionally, to work that many hours.

73. Furthermore, Defendants continued to retaliate against Plaintiffs for exercising their First Amendment rights. Defendants undertook multiple acts of retaliation during this period motivated by their retaliatory animus, including (1)

terminating a competent fire chief (Drum); (2) failing to establish a permanent and committed fire chief for a year, depriving the Department of much-needed leadership and supervision; and (3) and repeatedly failing to fully implement updated record-keeping software (that had been purportedly purchased in April 2018) to replace the Department's 20-year-old program. The Department still does not have this new program properly and fully implemented as of the filing date of this complaint.

74. Defendants' retaliatory actions and omissions during this period also included failing and refusing to make timely internal promotions and preventing internal promotions. Fire departments benefit most from the promotion of internal candidates, as opposed to external candidates who are unfamiliar with the department, its employees, the community, the local government, and the local geography. In departments as small as the Department, such promotions are also reinvigorating as they create a ripple effect and upward movement within the entire department. Finally, internal promotions incentivize employees to pursue training, develop and improve skills, build intra and inter-agency relationships, and seek mentorship and leadership experience. Defendants' retaliation against Plaintiffs deprived the Department of these benefits, unfairly harming the Department because Defendants' intent to suppress Plaintiffs' association activities and public speech about incompetent Department management.

75. Throughout 2021, Defendants further retaliated against Plaintiffs by refusing to negotiate labor contract terms reasonably and in good faith with MBFA. Defendants again used skewed salary numbers to propose unfair and unreasonable contract terms. To address this, MBFA paid for a neutral, independent salary survey of surrounding and comparable cities' firefighter salaries.[8] The survey demonstrated that

[8] The CITY refused to contribute to this expense because it was not actually interested in learning whether Plaintiff Firefighters' pay was fair or not.

Plaintiff Firefighters' salaries were average or even below average among seven adjacent cities.

76. The CITY ignored the results of the salary survey. Defendants continued to retaliate against Plaintiff Firefighters and MBFA by continuing to disseminate misleading information and the false assertion that Plaintiff Firefighters were the "highest paid" in the state. Defendants employed false propaganda to justify their retaliatory imposition of oppressive overtime hours on Plaintiff Firefighters for exercising their constitutional rights to speak out against Defendants' poor managerial decisions. Defendants sought to push Plaintiff Firefighters to the brink of burnout or to leave the Department.

77. In or around July or August 2021, the CITY informally proposed that the parties merely extend the prior contract; MBFA agreed provided that the extension include a modest cost-of-living adjustment of 3%, 2.5%, and 2.5% for each of the three years of the contract. The CITY refused, and continued to insist on contract terms that slashed MBFA members' benefits, wages, training opportunities, and autonomy. Defendants also attempted to retaliate against the Firefighters by communicating to new Chief Lang that MBFA leadership and Plaintiff Firefighters were bad employees who should not be trusted.

78. JENKINS initiated additional meritless HR investigations into MBFA leaders and Plaintiff Firefighters in retaliation for their association activities and statements challenging Defendants' mismanagement of the Department. She kept the investigations open for more than a year without resolution. These examples of misconduct, abuse of power, and retaliation in violation of Plaintiffs' First Amendment rights, with complete disregard for the safety and wellbeing of individual firefighters and the residents of Manhattan Beach continued and intensified in 2022.

//

//



BROWN WHITE & OSBORN LLP ATTORNEYS

## IV.

## FIREFIGHTERS SPEAK OUT PUBLICLY AGAIN TO COMBAT CITY'S MISMANAGEMENT OF THE FIRE DEPARTMENT (2022)

79. The CITY's persistent bad-faith negotiation tactics and other retaliatory acts and omissions demonstrated that Defendants had no intention of improving the Department's woeful lack of staff, leadership, and supervision. For this reason, MBFA and Plaintiff Firefighters had no choice but to seek help from the public by publicizing Defendants' dangerous practices and their impact on the Department's preparedness.

80. In January 2022, MBFA and Plaintiff Firefighters initiated an organized effort to educate and inform the public about the CITY's gross mismanagement of the Department and retaliatory conduct, which continued to threaten the health and wellbeing of Plaintiffs and the residents of Manhattan Beach.[9] Plaintiffs hoped that support and pressure from the taxpaying residents of Manhattan Beach would move Defendants to cease their illegal, retaliatory conduct and implement much-needed policy changes with respect to running the Department.

81. During Plaintiffs' concerted public communications to improve Defendants' management of the Department from January to September 2022, Plaintiffs undertook the following constitutionally-protected association activity and speech:

a) Plaintiffs created and released hundreds of public posts on social media platforms such as MBFA's Facebook, Instagram, NextDoor, and website providing information to the public about the inadequate staffing, exhausting overtime hours, lack of leadership, inadequate supervision, firefighter burnout, mental/emotional exhaustion, and stagnation plaguing the Department due to the

---

[9] MBFA expended considerable financial resources of its own, including on fees to hire a public relations consultant.



BROWN WHITE & OSBORN LLP ATTORNEYS

CITY's policies, illegal retaliatory acts, unfair demands, and unreasonable negotiation tactics;

b) Plaintiffs created and posted hundreds of posts on Plaintiff Firefighters' personal social media accounts, including Facebook, Instagram, and NextDoor relating to the same topics;

c) Plaintiffs created and publicized the Community Opinion Survey to communicate Plaintiffs' prioritization of medical and emergency services, with or without an equitable labor contract with the CITY;

d) Plaintiffs canvassed neighborhoods in Manhattan Beach and distributed more than 1,000 fliers or pamphlets, door hangers, and lawn signs providing information about the CITY's mismanagement of the Department and asking for the public's support;

e) While canvassing, Plaintiffs shared information about the mismanagement plaguing the Department to hundreds of members of the public;

f) Plaintiffs invited and encouraged Manhattan Beach residents to contact the CITY directly and attend CITY Council Meetings to voice their support for better management of the Department;

g) Plaintiffs created and publicized an online petition for Manhattan Beach citizens to sign if they supported Plaintiffs' plea for better Department management; each signature and submission of the petition generated an email to the CITY, MOE, JENKINS, and the fire chief;

h) Plaintiffs attended and spoke at private gatherings and meetings with residents and community members of Manhattan Beach at private residents' homes, town halls, and community centers;

i) Plaintiffs responded directly to hundreds of comments, messages, phone calls, and emails received from Manhattan Beach citizens who inquired about the issues Plaintiffs were publicizing;

j) Plaintiff spoke out in media interviews, providing information about mismanagement of the Department, the details of firefighter pay and benefits, the status of negotiations with the CITY, the CITY's unfair demands, and the misleading press releases and information Defendants were disseminating;

k) Plaintiffs created and publicized a video explaining the management issues threatening the Department and its preparedness;

l) Plaintiffs enlisted and paid a neutral and independent third-party factfinder to evaluate evidence from both sides (MBFA and the CITY) regarding their position as to the labor contract and recommend fair contract terms; and

m) Plaintiffs attended multiple CITY council meetings and spoke out about the ways in which the CITY's proposed contract terms would harm the Department and its ability to provide adequate emergency response services to residents.

82. In these ways, Plaintiffs exercised their First Amendment rights to associate, organize, and engage in political activity as an association, and to speak out publicly as individual citizens about matters of public concern.

## V.

## DEFENDANTS RETALIATE AGAINST PLAINTIFFS FOR EXERCISING THEIR FIRST AMENDMENT RIGHTS (2022)

83. Defendants thereafter retaliated against Plaintiffs for their constitutionally protected association and speech, as described in Paragraph 81 to (1) punish Plaintiffs for daring to criticize Defendants' exercise of power; (2) intimidate Plaintiffs and into silence; and (3) avoid accountability for Defendants' failings.

84. In January through September 2022, MOE and JENKINS's retaliatory course of conduct continued in the following ways:

a) They stalled contract negotiations, refusing to propose or accept reasonable terms, and declaring impasse through September 2022;




BROWN WHITE & OSBORN LLP ATTORNEYS

b) They made press releases and disseminated information to the public with false, misleading, and disparaging statements regarding MBFA, firefighters' wages, and the causes of the problems plaguing the Department;

c) They refused to fully comply with MBFA's Public Records Act ("PRA") requests, which sought records relating to the CITY's repeated failed negotiations with MBFA;

d) They enlisted members of the press to publish articles spreading the false and misleading claim that Plaintiff Firefighters are overpaid, while refusing to accept responsibility for forcing excessive overtime hours upon firefighters;

e) They continued to impose a staggering number of overtime hours on the firefighters by failing to adequately staff the Department; and

f) They continued to prevent and preventing Plaintiff Firefighters from receiving promotions for which they were eligible through November 2022 by (1) slashing the compensation/benefits package of the battalion chief rank; (2) refusing to rectify it despite repeated requests to do so in 2020, 2021, and 2022; (3) arbitrarily increasing battalion chief's minimum education qualifications; (4) pressuring Chief Lang through November 2022 to avoid promoting the most vocal MBFA leaders, such as Shenbaum, O'Brien, DESMOND, and Dulmage; (4) hiring only external candidates for battalion chief positions in 2022; and (5) unfairly manipulating battalion chief and Division Chief ("DC") promotional exams and active promotional lists in 2022;

g) They gave MBFA a last, best, and final contract proposal (the "CITY's last, best, and final") with unfair, punitive contract terms that decreased salary schedules across the board, decreased MBFA membership, imposed significant obstacles to pursue job training, unreasonably prohibited more than one employee to be on vacation per day, arbitrarily limited firefighters' use of their vacation time, and severely reduced available paid time off; and



BROWN WHITE & OSBORN LLP ATTORNEYS

h) They prevented MBFA and Plaintiff Firefighters from setting up a Community Booth at the Manhattan Beach Farmer's Market in May 2022 and blocked Plaintiffs' access to other public fora or limited public fora, specifically and explicitly to suppress any possible public statements or association activities relating to Defendants' mismanagement of the Department in which Plaintiffs may have engaged. It is unlawful for the CITY to intentionally exclude Plaintiffs from the use of and access to public spaces based on Plaintiffs' constitutionally protected speech.

85. Finally, Defendants ignored the petitions signed by Manhattan Beach residents, ignored the third-party salary survey, ignored the fact-finding report, and refused to participate in mediation with MBFA. The CITY's actions demonstrated that Defendants did not actually care about public safety or reaching a fair deal. Defendants' only goal was to retaliate against and punish Plaintiffs for acting collectively through the ASSOCIATION and for publicly criticizing Defendants' gross mismanagement, illegal retaliatory conduct, and abuse of power. Defendants showed utter disregard for the safety and wellbeing of Manhattan Beach's first responders and residents.

## VI.

## DEFENDANTS IMPOSE RETALIATORY LABOR CONTRACT UPON PLAINTIFFS AGAINST THEIR WILL

### A. Plaintiff Firefighters Publicly Object to CITY's Proposed Contract Terms and Mismanagement of Department; CITY Retaliates and Imposes Punitive and Arbitrary Contract Terms to "Control" Plaintiffs

86. On September 19, 2022, the CITY held a public hearing at which councilmembers were to vote to unilaterally impose the terms of the CITY's last, best, and final contract proposal upon MBFA and its members without their consent. During the public comment phase of the CITY council meeting on September 20, 2022, MBFA board members and Plaintiff Firefighters made public statements explaining



BROWN WHITE & OSBORN LLP ATTORNEYS

how imposition of the CITY's unilaterally proposed retaliatory terms would harm the Department and exacerbate the retaliation and mismanagement that was already crippling the Department. Manhattan Beach residents also made public comments objecting to the imposition of the unfair contract upon Plaintiffs.

87. Notwithstanding the categorical objections of MBFA and the city's residents, the CITY nonetheless imposed the retaliatory and punitive terms of the CITY's last, best, and final ("Imposed Contract"). In doing so, CITY Councilmember Suzanne Hadley spoke on behalf of the CITY: "I guess I want to start by saying [imposing the contract] isn't about cost. You know, *this is about control*… We need to return control of this single department to fire management and to the City Council and not leave it in the hands of a few labor leaders." (Italics added.) Thus, Hadley publicly confirmed that the primary motivation driving Defendants' conduct, including the imposition of the contract, was a desire to suppress Plaintiffs' constitutionally protected activities and exert power and control over them.

## B. <u>Retaliatory Terms of the Imposed Contract</u>

88. The Imposed Contract reduced Plaintiff Firefighters' pay, benefits, and autonomy, and decreased MBFA's membership by two positions, and provided only a 3% raise, which is more than negated by the cuts to Plaintiffs' pay scale and benefits. The evidence of Defendants' retaliatory motive is clear: All other full-time CITY employees received 3% annual pay raises *without* the cuts Defendants forced on Plaintiffs.[10] The terms of the Imposed Contract are as follows.

### 1) *Terms: Only one employee off per day*

89. This provision prohibits more than one Department employee to be on vacation at a time during a shift, even if another employee is willing to cover the shift. There was no such limitation prior to the Imposed Contract. This term does nothing to

---

[10] The cost-of-living adjustment in the Imposed Contract was the first raise for Plaintiff Firefighters in three years, while all other labor groups had received cost-of-living adjustment raises every year.





BROWN WHITE & OSBORN LLP ATTORNEYS

increase the preparedness or efficiency of the Department; it only makes it nearly impossible for firefighters to get time off that they need to attend important life events such as weddings, funerals, anniversaries, their children's sports games, awards ceremonies, and other significant occasions. As a result, due to the Imposed Contract, Plaintiff Firefighters missed many significant moments in the lives of their families, friends, and community—priceless experiences that can never be recovered. In fact, it became difficult for Plaintiff Firefighters to use their allotted vacation time at all before the end of the year due to this Retaliatory Term. Because their requests for time off were repeatedly denied, many firefighters simply stopped requesting vacation days.

**2) *Terms: Eliminates coverage and compensation for training***

90. Completion of certain training classes is often a prerequisite for a firefighter to qualify for certain teaching roles, leadership positions, and promotions. Training courses also give MBFA members opportunities to build relationships with other emergency response professionals and agencies and develop new skills for specific types of emergencies, such as ocean rescue protocol and urban search and rescue. In MBFA's previous agreements with the CITY, MBFA members were guaranteed coverage of a shift if it coincided with a training they wished to attend, and they were compensated for time spent in job-related training classes at their overtime rate. The Imposed Contract prohibits this. There is no benefit to the public, and no rational justification. It is purely punitive and retaliatory.

91. The Imposed Contract eliminates this compensation if the training takes place on a day the MBFA member is not scheduled to work. Still, because they cared about gaining new skills and improving ones they already had, many MBFA members were willing to forgo the pay to attend training classes. The Imposed Contract prevents them from even doing that. Plaintiff Firefighters were often unable to attend training classes because the Imposed Contract also eliminates coverage for shifts that conflict with training classes. This places the burden on Plaintiff Firefighters to find another

BROWN WHITE & OSBORN LLP ATTORNEYS

employee to cover their shift by "trading" shifts. However, such a trade is only allowed if it does not lead to overtime of any kind. Even more retaliation by Defendants.

92. Given the only-one-employee-off-per-day limitation described in Paragraph 73, the severe understaffing of the Department, and the extensive overtime hours MBFA members are already forced to work, it is nearly impossible to trade a shift with another employee without causing overtime. In conjunction with the contractual provision described in the following paragraph, the Imposed Contract makes it unjustifiably burdensome for any Plaintiff Firefighter to attend training classes, develop new skills, develop expertise, pursue teaching roles, and pursue leadership positions. And it does so with no benefit to the public and no rational justification—It is purely punitive.

**3) *Terms: Prohibits use of vacation time for training***

93. The Imposed Contract prohibits firefighters from using their own vacation time to attend training classes. This is clear retaliation since the Imposed Contract already eliminates compensation for training that takes place on days firefighters are not scheduled to work, including vacation time. It neither saves the CITY money nor improves the efficiency, economy, or preparedness of the Department. No other contract with any other bargaining unit in the CITY limits CITY employees' voluntary use of their vacation time.

94. It was already difficult for Plaintiff Firefighters to attend training due to their full schedules, the excessive overtime hours they were forced to cover due to the severe understaffing of the Department, and the sporadic nature of training class offerings. The Imposed Contract makes it even harder for the firefighters to obtain training. As a result of the Imposed Contract, Plaintiff Firefighters have not been able to complete a series of ongoing training classes they started before the Imposed Contract, have dramatically decreased training classes, or have given up attending classes altogether. Many simply stopped pursuing training entirely and most now




BROWN WHITE & OSBORN LLP
ATTORNEYS

attend a significantly reduced number of training classes per year, if any, compared to before the Imposed Contract.

95. While garnering no benefit to the residents and taxpayers of Manhattan Beach, this provision actually impairs the preparedness of the Department and its emergency response services. The imposed terms adversely affect Plaintiff Firefighters' pursuit of job-related training and increased income are a clear demonstration of the Defendants' unlawful motivations to stifle Plaintiff Firefighter's professional development, earnings, benefits, and autonomy for engaging in constitutionally protected association and public expression activities. These provisions provide no benefit to the public, and have no rational justification. They are purely punitive.

**4) *Terms: Eliminates conversion of three days of accrued sick time to vacation time***

96. Plaintiff Firefighters were previously permitted to convert three days of unused, accrued sick time to vacation time. Nearly every other bargaining unit in the CITY is permitted to enjoy this benefit. The Imposed Contract prohibits this conversion and forces Plaintiff Firefighters to accept pay for the sick days that they were previously allowed to convert to vacation days. This term makes it more difficult for firefighters to get the time off and for the physical, mental, and emotional rest they need, whilst garnering no savings or other benefit to the CITY. This provision decreases MBFA members' vacation time by three days and results in firefighters working more days of the year than ever before. It serves no purpose but to punish Plaintiff Firefighters for engaging in constitutionally protected association and expression activities. It provides no benefit to the public, and has no rational justification. It is purely punitive.

**5) *Terms: Eliminates four holiday days off***

97. Due to the nature of their profession, firefighters do not always get holidays off. As first responders, firefighters and paramedics work on Labor Day,



BROWN WHITE & OSBORN LLP
ATTORNEYS

Thanksgiving, the Fourth of July, and Christmas, for example. To compensate them for this sacrifice, previous contracts gave the firefighters 100 hours (about four days) of holiday leave per year, to be used when their schedules allowed. However, the Imposed Contract eliminates these four days off entirely, forcing MBFA members to instead accept 100 hours of base-rate pay. In other words, a firefighter who must work on Thanksgiving or on Christmas, for example, simply loses that time off. He will get paid but will not get an additional off day to make up for the time they missed with their family.

98. Cumulatively, the Imposed Contract takes away seven days that the fighters used to be able to take off, while nearly all other full-time CITY employees still get those days. This is targeted and clear retaliation. Under the Imposed Contract, Plaintiff Firefighters must each work significantly more days of the year for significantly less pay, less rest, less autonomy, and fewer benefits. This provision provides no benefit to the public, and has no rational justification. It is purely punitive.

**6) *Terms: Eliminates two MBFA positions***

99. Before the Imposed Contract, the Department had two positions called Fire Marshal and Fire Inspector, which firefighters could apply for and fill for a limited term. These positions required candidates to complete specified training courses to qualify and involved additional responsibilities in exchange for a 12.5% pay raise and the use of a department vehicle, which included fuel. Firefighters were incentivized to develop new skills, including leadership skills, and build relationships within the community by taking on such roles.

100. The Imposed Contract removes both positions, eliminating the firefighters' opportunities to make the additional income, shoulder new responsibilities, and develop professionally. This term not only deprives firefighters of professional development, it also directly decreases MBFA membership and, therefore, MBFA's resources. The provision provides no benefit to the public, and has no rational justification. It is purely punitive.



BROWN WHITE & OSBORN LLP ATTORNEYS

**7) *Terms: 40-50% cut in pay raises each rank can earn per year***

101. The non-management ranks of the Department are as follows: firefighter, firefighter-paramedic, engineer, and captain. Under MBFA's previous contracts with the CITY, the pay scale for the firefighter-paramedic rank requires a minimum of four years in the role to reach the maximum pay rate for that rank—the "top pay step." The Imposed Contract extends that time by 50%, such that it now takes a minimum of *six* years for a firefighter-paramedic to reach the top pay step. For example, before the Imposed Contract, if a firefighter-paramedic who performed well could conceivably receive a 25% raise over four years, he could expect a 6.2% pay increase per year approximately. Under the Imposed Contract, however, that same firefighter-paramedic can receive a maximum raise of only 4.2% each year, or 16.6% over four years—a 34% decrease in potential pay increases.

102. Similarly, fire engineer-paramedics and captains took a minimum of two years to reach the top pay step. The Imposed Contract doubles that time, such that it now takes at least *four* years to reach the maximum pay step of that rank—a 50% decrease in potential pay increases. The cumulative effect is that MBFA members must work twice as many years to earn the income of their predecessors. The CITY designed these terms to target and harm Plaintiff Firefighters because they engaged in constitutionally protected association activities and public criticism of Defendants' mismanagement of the Department.

**8) *Terms: Eliminates 5-Hour Block Billing For Film Shoot Services***

103. Generally, firefighters must be present when permitted filming occurs in the CITY. To account for the unpredictability of filming schedules and firefighters' time commitment in such circumstances, production companies agreed to contract terms requiring them to pay MBFA members in five-hour blocks. This block-billing ensures that firefighters are fairly compensated when they give up their off day, vacation time, or a full work shift to ensure the safety of filming sites. There is no associated cost to the CITY.



BROWN WHITE & OSBORN LLP ATTORNEYS

104. After the CITY voted to unilaterally enforce the Imposed Contract, MBFA and newly established Chief Lang attempted to renegotiate one of the most oppressive retaliatory terms by increasing the number of Department employees allowed to be on vacation per shift. During that negotiation, MOE and JENKINS discovered the block-billing provision and demanded that MBFA sacrifice it in exchange for a more lenient employees-off-per-shift term, an example of further retaliation by Defendants. As Plaintiffs had no leverage at all at this point, they agreed.[11] The elimination of the block-billing provision was incorporated into the Imposed Contract via amendment, also called a "Side Letter." Forcing Plaintiffs to give up the ability to block-bill for their time overseeing filming activities in the city served no legitimate purpose other than to further retaliate against Plaintiff Firefighters and humiliate and embarrass them for exercising their constitutionally protected First Amendment rights against the CITY's mismanagement of the Department.

**C. <u>Comparison with CITY's Other Labor Contracts</u>**

105. The Imposed Contract removes a number of benefits that almost all other CITY bargaining units have retained in their contracts, while imposing restrictions or burdens that almost all other CITY employees do not have to bear. For example:

a) All other agreements with the CITY allow employees to convert unused, accrued sick time to vacation time.

b) Almost all bargaining agreements with the CITY permit conversion of holiday time to vacation time in the event the holiday must be worked. No other contract imposes restrictions on employees' use of their vacation time, while the Retaliatory Contract prohibits Plaintiff Firefighters from using vacation days to attend training.

---

[11] The elimination of the block-billing was incorporated into the Imposed Contract via amendment, also known as a "Side Letter."



BROWN WHITE & OSBORN LLP ATTORNEYS

c) Defendants also increased the minimum number of years for each "pay step" of Plaintiffs' pay schedules while keeping the steps at 3 and 5, respectively for the Police Department, whose labor association MBPOA is most comparable to MBFA.

## VII.

## DEFENDANTS CONTINUE TO RETALIATE AGAINST PLAINTIFFS AFTER THE IMPOSED CONTRACT

### A. City Refuses MBFA and Plaintiff Firefighters the Benefits and Recruiting Incentives It Gave MBPOA

106. In November 2023, MBFA approached the CITY to request an amendment to the Imposed Contract to ensure that MBFA members receive the appropriate amount of bereavement paid time off in compliance with CITY policy. Additionally, due to a greatly reduced number of applicants to the Department, and because MBFA was having difficulty attracting qualified firefighters to the Department, MBFA requested that the CITY agree to amendments to the Imposed Contract to incentivize new recruits. The CITY's manipulation of the battalion chief compensation package, the dramatic slashes to existing MBFA members' pay and benefits under the Imposed Contract, as well as a number of cuts that applied only to new hires, such as elimination of the paramedic bonus, had made Department unappealing to qualified candidates. The CITY agreed to give MBFA members the requisite bereavement time off and an additional 10 hours of paid holiday time.

107. In the process of ratifying these amendments, Plaintiffs discovered that the CITY had agreed to amend MBPOA's contract with significantly better terms relating to vacation time and recruitment incentives. For example, the CITY agreed to give MBPOA a one-time bank of 100 hours of paid time off for all sworn officers, a bank of 80 hours of paid time off for all new hires, and vacation accrual rates based on an individual's years of service at any police department, not just the Manhattan Beach police department. Defendants' refusal to offer such terms to MBFA and Plaintiff

Firefighters or, at least, not slash pay and benefits, illustrates the undeniably retaliatory motives underlying the CITY's acts, including the Imposed Contract.

**B. Defendants Retaliate Against Plaintiff Firefighters for Exercising Their Rights to Petition the Government**

108. On or about February 22, 2024, MBFA informed Chief Lang of its intent to file this complaint and seek redress for the CITY's violation of Plaintiffs' First Amendment rights. Defendants heard the news and moved to retaliate against DESMOND a few weeks later by imposing inappropriately severe discipline for a petty complaint lodged against DESMOND nearly ten months prior. The complaint involved a Manhattan Beach police officer's objection to a derogatory comment DESMOND made about his portliness in reaction to Allard's repeated and unlawful practice of parking his non-electric vehicle in a space designated for only electric vehicles in a police and fire station parking lot. During the CITY's investigation of the complaint, the Officer admitted that (1) he had done this more than once in the past; (2) he did it intentionally to annoy electric vehicle drivers; and (3) DESMOND, who does drive an electric vehicle, had previously asked Allard to stop this unlawful practice.

The CITY concluded its investigation of Allard's complaint in September 2023. At the time, Chief Lang informed MBFA that Defendants did not intend to impose any discipline other than a reprimand upon DESMOND, whose 25-year record at the Department does not have one complaint or incidence of discipline in it. Nonetheless, after learning that MBFA and Plaintiff Firefighters intended to seek redress in court for Defendants' unlawful retaliation against Plaintiffs, Defendants sought for a way to retaliate against DESMOND for his participation therewith. Defendants' belated imposition of disproportionately severe discipline, amounting to a $7,000-$10,000 reduction in pay, is clear evidence of Defendants' retaliatory motive to punish MBFA and DESMOND for exercising their constitutional rights to associate, speak publicly upon matters of public concern, and petition the government for grievances.

As a result of Defendants' retaliation, MBFA must expend its attention, energy, and resources, including money on attorneys' fees, to defend DESMOND against the CITY's unfair and illegal actions.

**C. Defendants' Retaliation Harms Fire Captain DESMOND**

109. DESMOND has been a Manhattan Beach firefighter and paramedic since 1999 and resides in California with his wife and children. He is an MBFA member and served on MBFA's executive board for years. Defendants retaliated against him for exercising his First Amendment rights, including, but not limited to for his support to publicly announce the Vote of No Confidence, his participation in MBFA's efforts to publicize the CITY's mismanagement of the Department, and his own public statements regarding Defendant's mismanagement of the Department.

110. DESMOND actively participated in MBFA's contract negotiations team during the years leading up to the Imposed Contract. He contributed to MBFA's public discourse to expose Defendants' mismanagement of the Department. For example, he canvassed Manhattan Beach neighborhoods; spoke directly to hundreds of Manhattan Beach residents; passed out fliers, lawn signs, and/or door hangers; spoke at numerous meetings with Manhattan Beach residents, community leader, and business owners; and gave statements and interviews to the press. He was quoted in published articles on the topic of MBFA's campaign to improve conditions and management of the Department. DESMOND authored emails and messages or posts on social media platforms to educate the public about understaffing, diminishing resources, and forced overtime facing the Department. He personally responded to comments from members of the public on social media regarding these issues.

111. DESMOND accompanied Plaintiff Firefighters to CITY Council meetings when they delivered spoke out regarding the negative impact of the CITY's poor management and imposed contract upon the Department and public safety. He made public statements about the issues at CITY council meetings as well. He is one of the longest standing veterans of the Department. He believed his association activities and



BROWN WHITE & OSBORN LLP ATTORNEYS

public statements on the topic of Department management to be constitutionally protected, so he vigorously advocated for change and sought public support for the cause.

112. As a consequence, Defendants unlawfully targeted DESMOND and retaliated against him for engaging in these protected activities by, *inter alia*, (1) failing to investigate or address HR complaints against Management Staff; (2) ratifying the retaliatory acts of Espinosa's Battalion Chiefs; (3) repeatedly failing to implement updated resources or technologies for the Department; (4) failing to adequately staff the Department, resulting in excessive overtime hours to Plaintiff Firefighters; (5) refusing to institute internal promotions in a timely manner, thereby failing to establish adequate supervision and leadership in the Department; (6) slashing the battalion chiefs' compensation package and increasing battalion chiefs' minimum education requirements; (7) refusing, repeatedly, to remedy the problem; (8) making unfavorable and untrue statements about Plaintiff Firefighters to Chief Lang, encouraging him to have a distrusting and negative view of Plaintiffs; (9) hiring outside candidates instead of qualified internal candidates for the battalion chief positions when there were qualified internal candidates; (10) preventing DESMOND's promotion into a battalion chief position in or around September 2022; (11) refusing to negotiate in good faith regarding MBFA's labor contract; (12) refusing to take into account the results of the independent salary survey, factfinding report, and petitions signed by Manhattan Beach residents; (13) imposing the retaliatory terms of the Imposed Contract; and (14) after learning of Plaintiffs' intent to file this suit, imposing upon DESMOND inappropriately severe disciplinary measures for a petty complaint that was investigated and resolved nearly 10 months prior.

113. Defendants specifically deprived DESMOND of the battalion chief promotion he rightfully deserved and was qualified for, a promotion that would have significantly benefited the Department. Consequently, it is highly unlikely DESMOND will have an opportunity to pursue the position of fire chief, whereas he would have



BROWN WHITE & OSBORN LLP ATTORNEYS

had such opportunity had he timely received the battalion chief promotion, causing substantial monetary losses in pay and retirement.

114. Moreover, after learning that Plaintiff Firefighters intended to file this lawsuit, Defendants further retaliated against DESMOND for his participation in seeking redress from the government for the CITY's violations of his First Amendment rights: Despite the fact that the CITY had determined more than six months ago that Allard's allegations did not warrant any discipline other than a written reprimand, in April 2024 Defendants suddenly decided to impose upon DESMOND a $7,000-$10,000 pay reduction. This proposed discipline evidences Defendants' transparent motive to retaliate against DESMOND, especially in view of the facts that imposition of discipline are very rare in the Department and the 25-year Department veteran has no history of complaints or discipline.

115. The CITY's Imposed Contract deprived DESMOND of seven days of time off, the freedom to attend training on vacation days, and the opportunity to take the Fire Inspector or Fire Marshall position, with its associated increased pay, benefits, and professional development opportunities.

116. As a result of Defendants' illegal retaliation against Plaintiffs for exercising his First Amendment rights, DESMOND suffered significant economic and non-economic damages, including lost wages, lost overtime pay, lost benefits, lost training classes, lost promotions, lost autonomy over his time off, increased association dues, and lost professional opportunities he would have earned or acquired but for Defendants' unlawful acts.

117. Finally, DESMOND's professional and home life and personal relationships were significantly adversely impacted by Defendants' unlawful, retaliatory acts. Due to the forced overtime, understaffing, decreased vacation days, limitation on conversion of holiday time, and time-off limitations of the Imposed Contract, DESMOND had to work an excessive number of overtime hours and could not use his vacation time as he wished. As a result, he could not share in the important

life events of his family, friends, and community for several years. DESMOND was unable to be as present and active in the lives of his loved ones as he would have been if not for Defendants' retaliatory acts. That time and those moments are irrecoverable. DESMOND would have been much happier with much fewer overtime hours in exchange for a fully staffed Department, fair promotional and hiring practices, reasonable opportunity to take training classes, and more time with his wife, child, and community.

118. Any reasonable employee in DESMOND's position would have found Defendants' adverse employment actions materially adverse in that Defendants' actions would have dissuaded a reasonable employee from engaging in the protected activities at issue. Once enthusiastic about his job and eager to improve the Department, DESMOND withdrew completely from the MBFA executive board after the Imposed Contract and did not attempt to assume a leadership position again. DESMOND suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort due to Defendants' unlawful retaliatory acts.

**D. <u>Defendants' Retaliation Harms Fire Engineer FAIRBROTHER</u>**

119. FAIRBROTHER has been a Manhattan Beach firefighter and paramedic since 1997. He resides in California with his wife and two children. He is an MBFA member and has served on MBFA's executive board. Defendants retaliated against FAIRBROTHER for his support to publicly announce the Vote of No Confidence, his participation in MBFA's political activity, and his own public statements regarding Defendant's mismanagement of the Department.

120. FAIRBROTHER actively participated in MBFA's public communication efforts to expose Defendants' mismanagement of the Department. For example, he canvassed Manhattan Beach neighborhoods; spoke directly to hundreds of Manhattan Beach residents; passed out fliers, lawn signs, and/or door hangers; spoke at meetings with community leaders and business owners; and gave interviews or statements to the




BROWN WHITE & OSBORN LLP ATTORNEYS

press and public figures. FAIRBROTHER also participated in contract negotiations and advocated for better management of the Department with direct communications to CITY councilmembers and CITY employees. FAIRBROTHER accompanied Plaintiff Firefighters to CITY Council meetings when they delivered prepared speeches or statements regarding the negative impact of the CITY's poor management and imposed contract upon the Department and public safety. He made public statements about the issues at CITY council meetings.

121. FAIRBROTHER believed his association activities and public statements on the topic of Department management were constitutionally protected expression, so he advocated for firefighters often and passionately. Like other Plaintiff Firefighters, he genuinely wanted what was best for the Department in terms of leadership, staffing, resources, and preparedness to do their jobs.

122. As a consequence, Defendants unlawfully targeted FAIRBROTHER and retaliated against him for engaged in these protected activities by, *inter alia,* (1) failing to investigate or address HR complaints against Management Staff; (2) ratifying the retaliatory acts of Espinosa's Battalion Chiefs; (3) failing to implement updated resources or technologies for the Department; (4) failing to adequately staff the Department, resulting in excessive overtime hours to Plaintiff Firefighters; (5) refusing to institute internal promotions in a timely manner, thereby failing to establish adequate supervision and leadership in the Department; (6) slashing the battalion chiefs' compensation package and increasing battalion chief minimum education requirements; (7) making untrue and untrue and disparaging statements about Plaintiff Firefighters to Chief Lang, encouraging him to have a distrusting and negative view of Plaintiffs; (8) hiring outside candidates instead of qualified internal candidates for the battalion chief positions when internal candidates were well-qualified; (9) refusing to negotiate in good faith regarding MBFA's labor contract; (10) refusing to take into account the results of the independent salary survey, factfinding report, or petitions



BROWN WHITE & OSBORN LLP ATTORNEYS

signed by Manhattan Beach residents; and (11) imposing the retaliatory terms of the Imposed Contract.

123. Specifically, Defendants denied FAIRBROTHER training he requested while granting other firefighters, who did not speak publicly and exercise their First Amendment rights, whatever training classes they wanted. This prevented FAIRBROTHER from being able to qualify for and accept an offer he received to serve as a fire instructor in an ocean rescue course.

124. The CITY's Imposed Contract deprived FAIRBROTHER of seven days of paid time off, the freedom to attend training on vacation days, and the opportunity to take the Fire Inspector or Fire Marshall position, with its associated increased pay, benefits, and professional development opportunities. With the expectation that he would be able to pursue the fire inspector at a later date, FAIRBROTHER specifically withdrew his candidacy for the position so that another MBFA member who was closer to retirement could take it during the term directly prior to the Imposed Contract. Now, FAIRBROTHER will never get the opportunity to do so. Moreover, FAIRBROTHER's opportunity for pay raises has been halved as compared to before the Imposed Contract, such that he can expect approximately half of the wage increases of his predecessors for the same years worked.

125. As a result of Defendants' illegal retaliation against Plaintiffs, FAIRBROTHER suffered significant economic and non-economic damages, including lost wages, lost overtime pay, lost benefits, lost training classes, lost autonomy over his time off, increased association dues, and lost professional opportunities he would have earned or acquired but for Defendants' unlawful acts.

126. Finally, FAIRBROTHER's professional and home life and personal relationships were significantly and adversely impacted by Defendants' unlawful, retaliatory acts. Due to the forced overtime, understaffing, decreased vacation days, limitation on conversion of holiday time, and time-off limitations of the Imposed Contract, FAIRBROTHER had to work an excessive number of overtime hours and

could not use his vacation time as he wished. As a result, he could not share in the important life events of his family, friends, and community for several years. FAIRBROTHER was unable to be as present and active in the lives of his family as he would have been if not for Defendants' retaliatory acts. That time and those moments are irrecoverable. FAIRBROTHER would have been much happier with much fewer overtime hours in exchange for a fully staffed Department, fair promotional and hiring practices, reasonable opportunity to take training classes, and more time with his wife, child, and community.

127. Any reasonable employee in FAIRBROTHER's position would have found Defendants' and retaliatory employment actions materially adverse in that Defendants' actions would have dissuaded a reasonable employee from engaging in the protected activities at issue. Discouraged by Defendants' retaliatory acts against him and MBFA and disillusioned poor leadership (or lack thereof) in the Department, FAIRBROTHER opted out of the 2019 promotional exam for the captain rank and thereby relinquished pay he would have received as an acting captain. After the Imposed Contract, FAIRBROTHER was discouraged and withdrew from the MBFA executive board. He believed Defendants targeted him and thereafter substantially reduced all of his association and expression activities that he previously engaged in to advocate for better management of the Department and public safety. While had placed as high as 2nd on past exams, a disillusioned FAIRBROTHER put forth none of the effort he had in previous years and placed 7th on the 2022 captains' exam. He also stopped requesting permission for training classes because Defendants would never permit him to attend any due to their retaliatory motives. Once eager to contribute to and improve the Department, Defendants' unlawful acts created barriers in FAIRBROTHER's career trajectory and snuffed out his ambitions to develop as a leader for the Department.

//



BROWN WHITE & OSBORN LLP ATTORNEYS

128. FAIRBROTHER suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort due to Defendants' unlawful retaliatory acts.

**E. <u>Defendants' Retaliation Harms Fire Captain FALLS</u>**

129. FALLS has been a Manhattan Beach firefighter and paramedic since 2009 and resides in California with his wife and two children. FALLS is a member of MBFA's Executive Board, and Defendants retaliated against him for his support to publicly announce the Vote of No Confidence, his participation in MBFA's political activity, and his own public statements regarding Defendant's mismanagement of the Department.

130. FALLS has been on MBFA's contract negotiations team since 2013 and heavily contributed to MBFA's efforts to publicly expose Defendants' mismanagement of the Department. For example, he canvassed Manhattan Beach neighborhoods; spoke directly to hundreds of Manhattan Beach residents; passed out fliers, lawn signs, and/or door hangers; spoke at numerous meetings with Manhattan Beach residents, community leaders, and business owners; and gave interviews to the press. FALLS was also one of the principle MBFA members who ran MBFA's social media campaign to create public awareness of the CITY's mismanagement of the Department.

131. He made public statements of his own on his personal social media accounts and engaged with Manhattan Beach residents and community members regarding the issues. FALLS accompanied Plaintiff Firefighters to CITY Council meetings when they spoke publicly regarding the adverse impact of the CITY's poor management and imposed contract upon the Department and public safety. He prepared and made public statements of his own about the issues at CITY council meetings as well. Like other Plaintiff Firefighters, FALLS genuinely wanted what was best for the Department in terms of leadership, staffing, resources, and preparedness to do their jobs. He believed his association activities and public statements on the topic

BROWN WHITE & OSBORN LLP ATTORNEYS

of Department management were protected, so he vigorously advocated for change and sought public support for the cause.

132. As a consequence, Defendants unlawfully targeted FALLS and retaliated against him for engaged in these protected activities by, *inter alia*, (1) failing to investigate or address HR complaints against Management Staff; (2) ratifying the retaliatory acts of Espinosa's Battalion Chiefs; (3) failing to implement updated resources or technologies for the Department; (4) failing to adequately staff the Department, resulting in excessive overtime hours to Plaintiff Firefighters; (5) refusing to institute internal promotions in a timely manner, thereby failing to establish adequate supervision and leadership in the Department; (6) slashing the battalion chief compensation package and increasing battalion chief minimum education requirements; (7) making untrue and disparaging statements about Plaintiff Firefighters to Chief Lang, encouraging him to have a distrusting and negative view of Plaintiffs; (8) hiring outside candidates instead of qualified internal candidates for the battalion chief positions; (9) refusing to negotiate in good faith regarding MBFA's labor contract; (10) refusing to take into account the results of the independent salary survey, factfinding report, or petitions signed by Manhattan Beach residents; and (11) imposing the retaliatory terms of the Imposed Contract.

133. The CITY's Imposed Contract deprived FALLS of seven days of time off, the freedom to attend training on vacation days, and the opportunity to take the Fire Inspector or Fire Marshall position, with its associated increased pay, benefits, and professional development opportunities. Moreover, FALLS's opportunity for pay raises has been halved as compared to before the Imposed Contract, such that he can expect approximately half of the wage increases of his predecessors during the same number of years worked.

134. As a result of Defendants' illegal retaliation against Plaintiffs, FALLS suffered significant economic and non-economic damages, including lost wages, lost overtime pay, lost benefits, lost training classes, lost promotions, lost autonomy over




BROWN WHITE & OSBORN LLP ATTORNEYS

his time off, increased association dues, and lost professional opportunities he would have earned or acquired but for Defendants' unlawful acts.

135. Finally, FALLS's professional and home life and personal relationships were significantly and adversely impacted by Defendants' unlawful, retaliatory acts. Due to the forced overtime, understaffing, decreased vacation days, limitation on conversion of holiday time, and time-off limitations of the Imposed Contract, FALLS had to work an excessive number of overtime hours and could not use his vacation time as he wished. As a result, he could not share in the important life events of his family, friends, and community for several years. FALLS was unable to be as present and active in the lives of his loved ones as he would have been if not for Defendants' retaliatory acts. That time and those moments are irrecoverable—a source of great grief and regret to him and his family, to this day. FALLS would have been much happier with much fewer overtime hours in exchange for a fully staffed Department, fair promotional and hiring practices, reasonable opportunity to take training classes, and more time with his wife, children, and community.

136. Any reasonable employee in FALLS's position would have found Defendants' adverse and retaliatory employment actions materially adverse in that Defendants' actions would have dissuaded a reasonable employee from engaging in the protected activities at issue. Once enthusiastic about his job and eager to improve the Department, FALLS was demoralized and disillusioned by Defendants' unlawful retaliation against him for exercising his rights. Being an active member of the MBFA board caused him to be targeted, ultimately creating barriers in his career trajectory and deflating his goals to develop as a leader for the Department.

137. FALLS suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort due to Defendants' unlawful retaliatory acts.

//

**F. Defendants' Retaliation Harms Firefighter-Paramedic FUJIMOTO**

138. FUJIMOTO has been a Manhattan Beach firefighter, paramedic, and MBFA member since 2012 and resides in California with his wife. Defendants retaliated against FUJIMOTO for his support to publicly announce the Vote of No Confidence, the public statements he made concerning Defendants' mismanagement of the Department, and his participation in MBFA's efforts to publicize the CITY's mismanagement.

139. FUJIMOTO actively participated in MBFA's campaign to expose Defendants' mismanagement of the Department. For example, he canvassed Manhattan Beach neighborhoods; spoke directly to hundreds of Manhattan Beach residents; passed out fliers, lawn signs, or door hangers; and distributed T-shirts showing support for the Department's cause. FUJIMOTO also attended CITY Council meetings in solidarity and agreement with Plaintiff Firefighters when they delivered prepared speeches or statements regarding the negative impact of the CITY's poor management and imposed contract upon the Department and public safety.

140. Like other Plaintiff Firefighters, FUJIMOTO genuinely wanted what was best for the Department in terms of leadership, staffing, resources, and preparedness to do their jobs. He believed his association activities and public statements on the topic of Department management to be constitutionally protected, so he vigorously advocated for change and sought public support for the cause.

141. As a consequence, Defendants unlawfully targeted him and retaliated against him for engaged in these protected activities by, *inter alia,* (1) failing to investigate or address HR complaints against Management Staff; (2) ratifying the retaliatory acts of Espinosa's Battalion Chiefs; (3) failing to implement updated resources or technologies for the Department; (4) failing to adequately staff the Department, resulting in excessive overtime hours to Plaintiff Firefighters; (5) refusing to institute internal promotions in a timely manner, thereby failing to establish adequate supervision and leadership in the Department; (6) slashing the battalion chief



BROWN WHITE & OSBORN LLP ATTORNEYS

compensation package and increasing battalion chief minimum education criteria; (7) making untrue and untrue and disparaging statements about Plaintiff Firefighters to Chief Lang, encouraging him to have a distrusting and negative view of Plaintiffs; (8) hiring outside candidates instead of qualified internal candidates for the battalion chief positions; (9) refusing to negotiate in good faith regarding MBFA's labor contract; (10) refusing to take into account the results of the independent salary survey, factfinding report, or petitions signed by Manhattan Beach residents; and (11) imposing the retaliatory terms of the Imposed Contract.

142. Defendants also retaliated against FUJIMOTO by enforcing the Imposed Contract. Defendants deprived FUJIMOTO of seven days of paid time off, the freedom to attend training on vacation days, and the opportunity to take the Fire Inspector or Fire Marshall position, with its associated increased pay, benefits, and professional development opportunities. Moreover, FUJIMOTO's opportunity for pay raises has been halved as compared to before the Imposed Contract, such that he can expect approximately half of the wage increases of his predecessors for the same years worked. As a result of Defendants' illegal retaliation against Plaintiffs, FUJIMOTO significant economic and non-economic damages, including lost wages, lost overtime pay, lost benefits, lost training classes, lost promotions, lost autonomy over his time off, increased association dues, and lost professional opportunities he would have earned or acquired but for Defendants' unlawful acts.

143. Finally, FUJIMOTO's professional and home life and personal relationships were significantly and negatively impacted by Defendants' unlawful, retaliatory acts. Due to the forced overtime, understaffing, decreased vacation days, limitation on conversion of holiday time, and time-off limitations of the Imposed Contract, FUJIMOTO had to work an excessive number of overtime hours and could not use his vacation time as he wished. As a result, he could not share in the important life events of his family, friends, and community for several years. FUJIMOTO was unable to be as present and active in the lives of his loved ones as he would have been



BROWN WHITE & OSBORN LLP
ATTORNEYS

if not for Defendants' retaliatory acts. That time and those moments are irrecoverable. FUJIMOTO would have been much happier with much fewer overtime hours in exchange for a fully staffed Department, fair promotional and hiring practices, reasonable opportunity to take training classes, and more time with his family and community.

144. Any reasonable employee in FUJIMOTO's position would have found Defendants' adverse employment actions materially adverse in that Defendants' actions would have dissuaded a reasonable employee from engaging in the protected activities at issue. FUJIMOTO has intentionally avoided serving on MBFA's executive board because he does not wish to be targeted further.

145. FUJIMOTO suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort due to Defendants' unlawful retaliatory acts.

**G. <u>Defendants' Retaliation Harms Firefighter-Paramedic GRAFTON</u>**

146. GRAFTON has been a Manhattan Beach firefighter and paramedic since 2015 and resides in California with his wife and son. GRAFTON is a member of MBFA's executive board. Defendants retaliated against him for his support to publicly announce the Vote of No Confidence, his participation in MBFA's efforts to publicize the CITY's mismanagement of the Department, and his own public statements regarding Defendant's mismanagement.

147. GRAFTON was heavily involved in MBFA's campaign to expose Defendants' mismanagement of the Department. For example, he canvassed Manhattan Beach neighborhoods; spoke directly to hundreds of Manhattan Beach residents; passed out fliers, lawn signs, and/or door hangers; spoke at meetings with community leaders and business owners; and gave interviews to the press.

148. GRAFTON was one of the principle MBFA members who created and released hundreds of public social media posts and responses to increase public awareness of the CITY's mismanagement of and retaliation against the Department. In

solidarity, he accompanied Plaintiff Firefighters to CITY Council meetings when they spoke out about the adverse impact of the CITY's poor management and imposed contract upon the Department and public safety. GRAFTON made public statements of his own about the issues at CITY council meetings, made numerous posts on his personal social media accounts, and created a banner to fly on a local business owner's building to bring awareness to the issue. Like other Plaintiff Firefighters, GRAFTON genuinely wanted what was best for the Department in terms of leadership, staffing, resources, and preparedness to do their jobs. He believed his association activities and public communications on the topic of Department management was protected and that his cause was righteous, so he vigorously advocated for change and sought public support.

149. As a consequence, Defendants unlawfully targeted GRAFTON and retaliated against him for engaged in these protected activities by, *inter alia,* (1) failing to investigate or address HR complaints against Management Staff; (2) ratifying the retaliatory acts of Espinosa's Battalion Chiefs; (3) failing to implement updated resources or technologies for the Department; (4) failing to adequately staff the Department, resulting in excessive overtime hours to Plaintiff Firefighters; (5) refusing to institute internal promotions in a timely manner, thereby failing to establish adequate supervision and leadership in the Department; (6)slashing the battalion chief compensation package and increasing battalion chief minimum education criteria; (7) making false and disparaging statements about Plaintiff Firefighters to Chief Lang, encouraging him to have a distrusting and negative view of Plaintiffs; (8) hiring outside candidates instead of qualified internal candidates for the battalion chief positions; (9) refusing to negotiate in good faith regarding MBFA's labor contract; (10) refusing to take into account the results of the independent salary survey, factfinding report, or petitions signed by Manhattan Beach residents; and (11) imposing the retaliatory terms of the Imposed Contract.



BROWN WHITE & OSBORN LLP
ATTORNEYS

150. The CITY's Imposed Contract deprived GRAFTON of seven days of time off, the freedom to attend training on vacation days, and the opportunity to take the Fire Inspector or Fire Marshall position, with its associated increased pay, benefits, and professional development opportunities. Moreover, GRAFTON's opportunity for pay raises has been halved as compared to before the Imposed Contract, such that he can expect approximately half of the wage increases of his predecessors for the same years worked.

151. As a result of Defendants' illegal retaliation against Plaintiffs, GRAFTON suffered significant economic and non-economic damages, including lost wages, lost overtime pay, lost benefits, lost training classes, lost promotions, lost autonomy over his time off, increased association dues, and lost professional opportunities he would have earned or acquired but for Defendants' unlawful acts.

152. Finally, GRAFTON's professional and home life and personal relationships were significantly and adversely impacted by Defendants' unlawful, retaliatory acts. Due to the forced overtime, understaffing, decreased vacation days, limitation on conversion of holiday time, and time-off limitations of the Imposed Contract, GRAFTON had to work an excessive number of overtime hours and could not use his vacation time as he wished. As a result, he could not share in the important life events of his family, friends, and community for several years. GRAFTON was unable to be as present and active in the lives of his loved ones as he would have been if not for Defendants' retaliatory acts. That time and those moments are irrecoverable. GRAFTON would have been much happier with much fewer overtime hours in exchange for a fully staffed Department, fair promotional and hiring practices, reasonable opportunity to take training classes, and more time with his wife, son, and community.

153. After the Imposed Contract, Defendants continued to retaliate against GRAFTON by depriving him of the recognition he earned and deserved to receive from his community. Every year, the Rotary Club of Manhattan Beach recognizes as



BROWN WHITE & OSBORN LLP ATTORNEYS

"Firefighter/Paramedic of the Year" a Manhattan Beach firefighter, who is voted for the award by his peers in the Department. The Rotary Club president presents the award to the firefighter, who also receives gift card valued at approximately $500 and whose photo and mini biography is shared on the Rotary Club's social media accounts. It is an honor for a firefighter to receive this kind of recognition from his colleagues and community. In 2023, GRAFTON was the MBFA member who was voted for the award by Department employees. GRAFTON was happy to accept the award but did not wish to attend a CITY council meeting for that purpose, as he had no desire to fake a smile and function as if Defendants had not been oppressing and unlawfully retaliating against him, MBFA, and other Plaintiff Firefighters for the last several years.

154. Defendants directed Chief Lang to tell GRAFTON that making a public appearance at a CITY council meeting was a requirement of the award, which is false. The Rotary Club is not affiliated with the CITY and makes no such requirement of its honorees. Because GRAFTON refused to make a public display of goodwill toward the CITY, Defendants directed Chief Lang to deprive GRAFTON of the recognition he had earned as Firefighter of the Year and give it to someone who was willing to bend to the CITY's will. Pressed by his employer, Chief Lang took the award away from GRAFTON and gave it to another firefighter instead. As a result of Defendants' retaliation, GRAFTON received none of the acknowledgement or benefits his community wished to bestow upon him for his service to the city.

155. Any reasonable employee in GRAFTON's position would have found Defendants' adverse employment actions materially adverse in that Defendants' actions would have dissuaded a reasonable employee from engaging in the protected activities at issue. GRAFTON suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort due to Defendants' unlawful retaliatory acts.

BROWN WHITE & OSBORN LLP
ATTORNEYS

**H. Defendants' Retaliation Harms Firefighter-Paramedic Captain HECK**

156. HECK has been a Manhattan Beach firefighter and paramedic since 2016 and resides in California with his wife and two children. As of January 2024, HECK is the MBFA president, and Defendants retaliated against him for his support to publicly announce the Vote of No Confidence, his participation in MBFA's efforts to publicize the CITY's mismanagement of the Department, and his own public statements regarding Defendant's mismanagement.

157. HECK has been part of the MBFA board and MBFA's contract negotiating team for many years. He was heavily involved in MBFA's campaign to expose Defendants' mismanagement of the Department. For example, he canvassed Manhattan Beach neighborhoods; spoke directly to hundreds of Manhattan Beach residents; passed out fliers, lawn signs, and/or door hangers to the public; and assisted in managing MBFA's social media communications. HECK accompanied Plaintiff Firefighters to CITY Council meetings when they spoke out regarding the adverse impact of the CITY's poor management and imposed contract upon the Department and public safety. He made public statements about the issues at CITY council meetings as well.

158. Like other Plaintiff Firefighters, HECK genuinely wanted what was best for the Department in terms of leadership, staffing, resources, and preparedness to do their jobs. HECK believed his association activities and public statements on the topic of Department management to be constitutionally protected, so he vigorously advocated for change and sought public support for the cause.

159. As a consequence, Defendants unlawfully targeted HECK and retaliated against him for engaged in these protected activities by, *inter alia*, (1) failing to investigate or address HR complaints against Management Staff; (2) ratifying the retaliatory acts of Espinosa's Battalion Chiefs; (3) failing to implement updated resources or technologies for the Department; (4) failing to adequately staff the Department, resulting in excessive overtime hours to Plaintiff Firefighters; (5) refusing




BROWN WHITE & OSBORN LLP ATTORNEYS

to institute internal promotions in a timely manner, thereby failing to establish adequate supervision and leadership in the Department; (6)slashing the battalion chief compensation package and increasing battalion chief minimum education criteria; (7) making untrue and disparaging statements about Plaintiff Firefighters to Chief Lang, encouraging him to have a distrusting and negative view of Plaintiffs; (8) hiring outside candidates instead of qualified internal candidates for the battalion chief positions; (9) refusing to negotiate in good faith regarding MBFA's labor contract; (10) refusing to take into account the results of the independent salary survey, factfinding report, or petitions signed by Manhattan Beach residents; and (11) imposing the retaliatory terms of the Imposed Contract.

160. Through the CITY's Imposed Contract, Defendants deprived HECK of seven days of time off, the freedom to attend training on vacation days, and the opportunity to take the Fire Inspector or Fire Marshall position, with its associated increased pay, benefits, and professional development opportunities. Moreover, HECK's opportunity for pay raises has been halved as compared to before the Imposed Contract, such that he can expect approximately half of the wage increases of his predecessors for the same years worked.

161. As a result of Defendants' illegal retaliation against Plaintiffs, HECK suffered significant economic and non-economic damages, including lost wages, lost overtime pay, lost benefits, lost training classes, lost promotions, lost autonomy over his time off, increased association dues, and lost professional opportunities he would have earned or acquired but for Defendants' unlawful acts.

162. Finally, HECK's professional and home life and personal relationships were significantly and negatively impacted by Defendants' unlawful, retaliatory acts. Due to the forced overtime, understaffing, decreased vacation days, limitation on conversion of holiday time, and time-off limitations of the Imposed Contract, HECK had to work an excessive number of overtime hours and could not use his vacation time as he wished. As a result, he could not share in the important life events of his




BROWN WHITE & OSBORN LLP ATTORNEYS

family, friends, and community for several years. HECK was unable to be as present and active in the lives of his loved ones as he would have been if not for Defendants' retaliatory acts. That time and those moments are irrecoverable. HECK would have been much happier with much fewer overtime hours in exchange for a fully staffed Department, fair promotional and hiring practices, reasonable opportunity to take training classes, and more time with his wife, children, and community.

163. Defendants directed Chief Lang to tell GRAFTON that making a public appearance at a CITY council meeting was a requirement of the award, which is false. The Rotary Club is not affiliated with the CITY and makes no such requirement of its honorees. Because GRAFTON refused to make a public display of goodwill toward the CITY, Defendants directed Chief Lang to deprive GRAFTON of the recognition he had earned as Firefighter of the Year and give it to someone who was willing to bend to the CITY's will. Pressed by his employer, Chief Lang took the award away from GRAFTON and gave it to Dulmage instead. As a result of Defendants' retaliation, GRAFTON received none of the acknowledgement or benefits his community wished to bestow upon him for his service to the city.

164. Any reasonable employee in HECK's position would have found Defendants' adverse employment actions materially adverse in that Defendants' actions would have dissuaded a reasonable employee from engaging in the protected activities at issue. HECK suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort due to Defendants' unlawful retaliatory acts.

**I. <u>Defendants' Retaliation Harms Firefighter-Paramedic JACOBSON</u>**

165. JACOBSON has been a Manhattan Beach firefighter and paramedic since 2017 and resides in California with his wife and three children. JACOBSON is an MBFA member and has served on the MBFA executive board. Defendants retaliated against JACOBSON for his participation in MBFA's political activity, and his own public statements regarding Defendant's mismanagement of the Department.

166. JACOBSON served on MBFA's contract negotiations team during the period leading up to the Imposed Contract and heavily contributed to MBFA's campaign to increase public awareness of the CITY's mismanagement of the Department. For example, he canvassed Manhattan Beach neighborhoods; spoke directly to hundreds of Manhattan Beach residents; passed out fliers, lawn signs, and/or door hangers; spoke at community meetings; and gave interviews to the press.

167. JACOBSON attended CITY council meetings in solidarity and agreement with Plaintiff Firefighters when they delivered prepared speeches or statements regarding the negative impact of the CITY's poor management and imposed contract upon the Department and public safety. JACOBSON also made public statements of his own at such meetings on the same topics.

168. Like other Plaintiff Firefighters, JACOBSON genuinely wanted what was best for the Department in terms of leadership, staffing, resources, and preparedness to do their jobs. He believed his association activities and public statements on the topic of Department management to be constitutionally protected, so he vigorously advocated for change and sought public support for the cause.

169. As a consequence, Defendants unlawfully targeted JACOBSON and retaliated against him for engaged in these protected activities by, *inter alia*, (1) failing to investigate or address HR complaints against Management Staff; (2) ratifying the retaliatory acts of Espinosa's Battalion Chiefs; (3) failing to implement updated resources or technologies for the Department; (4) failing to adequately staff the Department, resulting in excessive overtime hours to Plaintiff Firefighters; (5) refusing to institute internal promotions in a timely manner, thereby failing to establish adequate supervision and leadership in the Department; (6) slashing the battalion chief compensation package and increasing battalion chief minimum education criteria; (7) making untrue and disparaging statements about Plaintiff Firefighters to Chief Lang, encouraging him to have a distrusting and negative view of Plaintiffs; (8) hiring outside candidates for the battalion chief positions; (9) refusing to negotiate in good

faith regarding MBFA's labor contract; (10) refusing to take into account the results of the independent salary survey, factfinding report, or petitions signed by Manhattan Beach residents; and (11) imposing the retaliatory terms of the Imposed Contract.

170. Through the CITY's Imposed Contract, Defendants deprived JACOBSON of seven days of time off, the freedom to attend training on vacation days, and the opportunity to take the Fire Inspector or Fire Marshall position, with its associated increased pay, benefits, and professional development opportunities. Moreover, JACOBSON's opportunity for pay raises has been halved as compared to before the Imposed Contract, such that he can expect approximately half of the wage increases of his predecessors for the same years worked. As a result of Defendants' illegal retaliation against Plaintiffs, JACOBSON suffered significant economic and non-economic damages, including lost wages, lost overtime pay, lost benefits, lost training classes, lost promotions, lost autonomy over his time off, increased association dues, and lost professional opportunities he would have earned or acquired but for Defendants' unlawful acts.

171. Finally, JACOBSON's professional and home life and personal relationships were significantly and adversely impacted by Defendants' unlawful, retaliatory acts. Due to the forced overtime, understaffing, decreased vacation days, limitation on conversion of holiday time, and time-off limitations of the Imposed Contract, JACOSON had to work an excessive number of overtime hours and could not use his vacation time as he wished. As a result, he could not share in the important life events of his family, friends, and community for several years. JACOBSON was unable to be as present and active in the lives of his loved ones as he would have been if not for Defendants' retaliatory acts. That time and those moments are irrecoverable a source of great grief and regret to him, to this day. JACOBSON would have been much happier with much fewer overtime hours in exchange for a fully staffed Department, fair promotional and hiring practices, reasonable opportunity to take training classes, and more time with his wife, children, and community.



BROWN WHITE & OSBORN LLP ATTORNEYS

172. Any reasonable employee in JACOBSON's position would have found Defendants' adverse employment actions materially adverse in that Defendants' actions would have dissuaded a reasonable employee from engaging in the protected activities at issue. Defendants' retaliatory acts did exactly that: Due to Defendants' retaliation, JACOBSON withdrew from the MBFA board to avoid being targeted by Defendants. Once enthusiastic about his job and eager to improve the Department, JACOBSON was demoralized and disillusioned by Defendants' unlawful retaliation against him for exercising his rights. Being an active member of the MBFA board caused him to be targeted, ultimately creating barriers in his career trajectory and deflating his goals to develop as a leader for the Department.

173. JACOBSON suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort due to Defendants' unlawful retaliatory acts.

**J. <u>Defendants' Retaliation Harms Fire Engineer MCARTHUR</u>**

174. MCARTHUR has been a Manhattan Beach firefighter and paramedic since 2011 and resides in California with his wife and two children. MCARTHUR is a member of MBFA's executive board, and Defendants retaliated against him for his support to publicly announce the Vote of No Confidence, his participation in MBFA's political activity, and his own public statements regarding Defendant's mismanagement of the Department.

175. MCARTHUR spearheaded MBFA's campaign to expose Defendants' mismanagement of the Department. For example, he canvassed Manhattan Beach neighborhoods; spoke directly to hundreds of Manhattan Beach residents; passed out fliers, lawn signs, and/or door hangers; spoke at numerous meetings with Manhattan Beach residents, community leader, and business owners; and gave interviews to the press. MCARTHUR was the primary manager of MBFA's social media campaign to build public awareness of the CITY's mismanagement of the Department.

176. He made public statements of his own on his personal social media accounts and engaged with Manhattan Beach residents and community members regarding the issues. In solidarity, MCARTHUR accompanied Plaintiff Firefighters to CITY Council meetings when they delivered prepared speeches or statements regarding the negative impact of the CITY's poor management and imposed contract upon the Department and public safety. He prepared and made public statements of his own about the issues at CITY council meetings as well. Like other Plaintiff Firefighters, MCARTHUR genuinely wanted what was best for the Department in terms of leadership, staffing, resources, and preparedness to do their jobs. He believed his association activities and public statements on the topic of Department management to be constitutionally protected, so he vigorously advocated for change and sought public support for the cause.

177. As a consequence, Defendants unlawfully targeted MCARTHUR and retaliated against him for engaged in these protected activities by, *inter alia*, (1) failing to investigate or address HR complaints against Management Staff; (2) ratifying the retaliatory acts of Espinosa's Battalion Chiefs; (3) failing to implement updated resources or technologies for the Department; (4) failing to adequately staff the Department, resulting in excessive overtime hours to Plaintiff Firefighters; (5) refusing to institute internal promotions in a timely manner, thereby failing to establish adequate supervision and leadership in the Department; (6) slashing the battalion chief compensation package and increasing battalion chief minimum education criteria; (7) making untrue and disparaging statements about Plaintiff Firefighters to Chief Lang, encouraging him to have a distrusting and negative view of Plaintiffs; (8) hiring outside candidates for the battalion chief positions; (9) refusing to negotiate in good faith regarding MBFA's labor contract; (10) refusing to take into account the results of the independent salary survey, factfinding report, or petitions signed by Manhattan Beach residents; and (11) imposing the retaliatory terms of the Imposed Contract.



BROWN WHITE & OSBORN LLP
ATTORNEYS

178. The CITY's Imposed Contract deprived MCARTHUR of seven days of time off, the freedom to attend training on vacation days, and the opportunity to take the Fire Inspector or Fire Marshall position, with its associated increased pay, benefits, and professional development opportunities. Moreover, MCARTHUR's opportunity for pay raises has been halved as compared to before the Imposed Contract, such that he can expect approximately half of the wage increases of his predecessors for the same years worked. As a result of Defendants' illegal retaliation against Plaintiffs, MCARTHUR suffered significant economic and non-economic damages, including lost wages, lost overtime pay, lost benefits, lost training classes, lost promotions, lost autonomy over his time off, increased association dues, and lost professional opportunities he would have earned or acquired but for Defendants' unlawful acts.

179. Finally, MCARTHUR's professional and home life and personal relationships were significantly and adversely impacted by Defendants' unlawful, retaliatory acts. Due to the forced overtime, understaffing, decreased vacation days, limitation on conversion of holiday time, and time-off limitations of the Imposed Contract, MCARTHUR had to work an excessive number of overtime hours and could not use his vacation time as he wished. As a result, he could not share in the important life events of his family, friends, and community for several years. MCARTHUR was unable to be as present and active in the lives of his loved ones as he would have been if not for Defendants' retaliatory acts. That time and those moments are irrecoverable. MCARTHUR would have been much happier with much fewer overtime hours in exchange for a fully staffed Department, fair promotional and hiring practices, reasonable opportunity to take training classes, and more time with his wife, child, and community.

180. Any reasonable employee in MCARTHUR's position would have found Defendants' adverse employment actions materially adverse in that Defendants' actions would have dissuaded a reasonable employee from engaging in the protected activities at issue. Defendants' retaliatory acts did exactly that: Once enthusiastic about



BROWN WHITE & OSBORN LLP
ATTORNEYS

his job and eager to improve the Department, MCARTHUR was demoralized and disillusioned by Defendants' unlawful retaliation against him for exercising his rights. He concluded that protesting against those in power was futile and the only thing left to do was keep his head down and abandon any notions of holding Defendants accountable for their gross negligence and abuse of power.

181. MCARTHUR suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort due to Defendants' unlawful retaliatory acts.

**K. Defendants' Retaliation Harms Firefighter-Paramedic MEJIA**

182. MEJIA has been a Manhattan Beach firefighter and paramedic since 2004 and served as MBFA President for over 11 years, until Defendants forced the Imposed Contract on Plaintiffs. Fiercely committed to the Department and the safety of Manhattan Beach residents, MEJIA put his heart and soul into guiding MBFA in its relationship with the CITY and Defendants. He patiently nurtured MBFA's relationship with Defendants and negotiated with the CITY for many years before MBFA was forced to make the risky but necessary decision to publicly expose the CITY's gross failures to effectively manage the Department. Defendants retaliated against MEJIA for his support to publicly announce the Vote of No Confidence, his participation in MBFA's efforts to publicize the CITY's mismanagement of the Department, and his own public statements regarding Defendant's mismanagement.

183. As MBFA President, MEJIA personally and publicly delivered the vote to Defendants at a CITY Council meeting on March 6, 2018. He was heavily involved with contract negotiations with Defendants and led the association through its public campaign to expose Defendants' mismanagement of the Department. MEJIA gave statements at numerous CITY Council meetings pleading with the CITY to negotiate reasonably and to refrain from imposing the retaliatory terms which now comprise the Imposed Contract. He sent emails, wrote letters, spoke at community gatherings at Manhattan Beach residents' homes and social clubs, and gave statements to the press




BROWN WHITE & OSBORN LLP ATTORNEYS

regarding the excessive overtime, understaffing, and retaliation the Department was facing due to the CITY's incompetence and vindictiveness.

184. As MBFA President, MEJIA sourced and hired the attorneys, neutral factfinders, consultants, coaches, PR representatives, and other professionals in the MBFA's and Plaintiff Firefighter's David-versus-Goliath struggle to negotiate with the CITY and combat retaliatory investigations launched by Defendants. MEJIA also helped Plaintiff Firefighters as they canvassed Manhattan Beach neighborhoods and passed out fliers, lawn signs, and/or door hangers to hundreds of residents. Like other Plaintiff Firefighters, MEJIA genuinely wanted what was best for the Department in terms of leadership, staffing, resources, and preparedness to do their jobs. He believed his association activities and public statements on the topic of Department management to be constitutionally protected, so he vigorously advocated for change and sought public support for the cause.

185. As a consequence, Defendants unlawfully targeted MEJIA and retaliated against him for engaged in these protected activities by, *inter alia*, (1) failing to investigate or address HR complaints against Management Staff; (2) ratifying the retaliatory acts of Espinosa's Battalion Chiefs; (3) repeatedly failing to implement updated resources or technologies for the Department; (4) failing to adequately staff the Department, resulting in excessive overtime hours to Plaintiff Firefighters; (5) refusing to institute internal promotions in a timely manner, thereby failing to establish adequate supervision and leadership in the Department; (6) slashing the battalion chief compensation package and increasing battalion chief minimum education criteria; (7) making untrue and disparaging statements about Plaintiff Firefighters to Chief Lang, encouraging him to have a distrusting and negative view of Plaintiffs; (8) hiring outside candidates for the battalion chief positions; (9) refusing to negotiate in good faith regarding MBFA's labor contract; (10) launching retaliatory and frivolous investigations against MEJIA; (11) refusing to take into account the results of the




BROWN WHITE & OSBORN LLP ATTORNEYS

independent salary survey, factfinding report, or petitions signed by Manhattan Beach residents; and (12) imposing the retaliatory terms of the Imposed Contract.

186. The CITY's Imposed Contract deprived MEJIA of seven days of time off, the freedom to attend training on vacation days, and the opportunity to take the Fire Inspector or Fire Marshall position, with its associated increased pay, benefits, and professional development opportunities. Moreover, MEJIA's opportunity for pay raises has been halved as compared to before the Imposed Contract, such that he can expect approximately half of the wage increases of his predecessors for the same years worked. As a result of Defendants' illegal retaliation against Plaintiffs, MEJIA suffered significant economic and non-economic damages, including lost wages, lost overtime pay, lost benefits, lost training classes, lost promotions, lost autonomy over his time off, increased association dues, and lost professional opportunities he would have earned or acquired but for Defendants' unlawful acts.

187. Finally, MEJIA's professional and home life and personal relationships were significantly and adversely impacted by Defendants' unlawful, retaliatory acts. Due to the forced overtime, understaffing, decreased vacation days, limitation on conversion of holiday time, and time-off limitations of the Imposed Contract, MEJIA had to work an excessive number of overtime hours and could not use his vacation time as he wished. As a result, he could not share in the important life events of his family, friends, and community for several years. MEJIA was unable to be as present and active in the lives of his loved ones as he would have been if not for Defendants' retaliatory acts. That time and those moments are irrecoverable. MEJIA would have been much happier with much fewer overtime hours in exchange for a fully staffed Department, fair promotional and hiring practices, reasonable opportunity to take training classes, and more time with his family and community.

188. Any reasonable employee in MEJIA's position would have found Defendants' adverse employment actions materially adverse in that Defendants' actions would have dissuaded a reasonable employee from engaging in the protected

activities at issue. Once enthusiastic about his job and eager to improve the Department, MEJIA was demoralized and disillusioned by Defendants' unlawful retaliation against him for exercising his rights. He concluded that protesting against those in power was futile and the only thing left to do was keep his head down and abandon any notions of holding Defendants accountable for their gross negligence and abuse of power. For the first time in over a decade, MEJIA withdrew completely from the MBFA board. MEJIA suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort due to Defendants' unlawful retaliatory acts.

**L. <u>Defendants' Retaliation Harms Fire Engineer RICE</u>**

189. RICE has been a Manhattan Beach firefighter and paramedic since 1999 and resides in California with his wife and children. RICE has served on MBFA's executive board, and Defendants retaliated against RICE for his support to publicly announce the Vote of No Confidence, the public statements he made concerning Defendants' mismanagement of the Department, and his participation in MBFA's political activity.

190. RICE was on MBFA's negotiations team and an executive board member during the years 2018-2020. RICE actively participated in MBFA's campaign to expose Defendants' mismanagement of the Department. For example, he canvassed Manhattan Beach neighborhoods; spoke directly to hundreds of Manhattan Beach residents; and passed out fliers, lawn signs, and/or door hangers; and distributing T-shirts showing support for the Department's cause. RICE assisted in management of MBFA's social media campaign. In solidarity, he accompanied Plaintiff Firefighters to CITY Council meetings when they delivered prepared speeches or statements regarding the negative impact of the CITY's poor management and imposed contract upon the Department and public safety. He prepared and made public statements of his own about the issues at CITY council meetings as well.



BROWN WHITE & OSBORN LLP ATTORNEYS

191. Like other Plaintiff Firefighters, RICE genuinely wanted what was best for the Department in terms of leadership, staffing, resources, and preparedness to do their jobs. He believed his association activities and public statements on the topic of Department management to be constitutionally protected, so he vigorously advocated for change and sought public support for the cause.

192. As a consequence, Defendants unlawfully targeted RICE and retaliated against him for engaged in these protected activities by, *inter alia,* (1) failing to investigate or address HR complaints against Management Staff; (2) ratifying the retaliatory acts of Espinosa's Battalion Chiefs; (3) failing to implement updated resources or technologies for the Department; (4) failing to adequately staff the Department, resulting in excessive overtime hours to Plaintiff Firefighters; (5) refusing to institute internal promotions in a timely manner, thereby failing to establish adequate supervision and leadership in the Department; (6) slashing the battalion chief compensation package and increasing battalion chief minimum education criteria; (7) making untrue and disparaging statements about Plaintiff Firefighters to Chief Lang, encouraging him to have a distrusting and negative view of Plaintiffs; (8) hiring outside candidates for the battalion chief positions; (9) refusing to negotiate in good faith regarding MBFA's labor contract; (10) refusing to take into account the results of the independent salary survey, factfinding report, or petitions signed by Manhattan Beach residents; and (11) imposing the retaliatory terms of the Imposed Contract.

193. The CITY's Imposed Contract deprived RICE of seven days of time off, the freedom to attend training on vacation days, and the opportunity to take the Fire Inspector or Fire Marshall position, with its associated increased pay, benefits, and professional development opportunities. Moreover, RICE's opportunity for pay raises has been halved as compared to before the Imposed Contract, such that he can expect approximately half of the wage increases of his predecessors for the same years worked. As a result of Defendants' illegal retaliation against Plaintiffs, RICE suffered significant economic and non-economic damages, including lost wages, lost overtime



BROWN WHITE & OSBORN LLP
ATTORNEYS

pay, lost benefits, lost training classes, lost promotions, lost autonomy over his time off, increased association dues, and lost professional opportunities he would have earned or acquired but for Defendants' unlawful acts.

194. Finally, RICE's professional and home life and personal relationships were significantly and adversely impacted by Defendants' unlawful, retaliatory acts. Due to the forced overtime, understaffing, decreased vacation days, limitation on conversion of holiday time, and time-off limitations of the Imposed Contract, RICE had to work an excessive number of overtime hours and could not use his vacation time as he wished. As a result, he could not share in the important life events of his family, friends, and community for several years. RICE was unable to be as present and active in the lives of his loved ones as he would have been if not for Defendants' retaliatory acts. That time and those moments are irrecoverable—a source of great grief and regret to him still. RICE would have been much happier with much fewer overtime hours in exchange for a fully staffed Department, fair promotional and hiring practices, reasonable opportunity to take training classes, and more time with his wife, children, and community.

195. Any reasonable employee in RICE's position would have found Defendants' adverse employment actions materially adverse in that Defendants' actions would have dissuaded a reasonable employee from engaging in the protected activities at issue. Defendants intentionally retaliated against him for his part in the contentious contract negotiations and participation as MBFA leadership. As a result, RICE substantially reduced all of his association and expression activities that he previously engaged in to advocate for better management of the Department and public safety. Discouraged and disillusioned by the Imposed Contract, RICE failed the captains' exam that year for the first time in 16 years. After the Imposed Contract, RICE has refrained from seeking a position on the MBFA executive board to avoid further retaliation. Once eager to contribute to and improve the Department, Defendants' retribution snuffed out RICE's hopes and ambitions to develop as a leader



BROWN WHITE & OSBORN LLP
ATTORNEYS

for the Department. RICE suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort due to Defendants' unlawful retaliatory acts.

**M. <u>Defendants' Retaliation Harms Fire Engineer STRATTON</u>**

196. STRATTON has been a Manhattan Beach firefighter, paramedic, and MBFA member since 2006 and resides in California with his wife and children. Defendants retaliated against him for his support to publicly announce the Vote of No Confidence, his participation in MBFA's political activity, and his own public statements regarding Defendant's mismanagement of the Department.

197. Stratton actively participated in MBFA's campaign to expose Defendants' mismanagement of the Department. For example, he canvassed Manhattan Beach neighborhoods; spoke directly to hundreds of Manhattan Beach residents; helped design lawn signs; and passed out fliers, lawn signs, and/or door hangers. In solidarity, STRATTON accompanied Plaintiff Firefighters to CITY Council meetings when they delivered prepared speeches or statements regarding the negative impact of the CITY's poor management and imposed contract upon the Department and public safety.

198. Like other Plaintiff Firefighters, STRATTON genuinely wanted what was best for the Department in terms of leadership, staffing, resources, and preparedness to do their jobs. He believed his association activities and public statements on the topic of Department management was protected and that his cause was righteous, so he vigorously advocated for change and sought public support.

199. As a consequence, Defendants unlawfully targeted STRATTON and retaliated against him for engaged in these protected activities by, *inter alia,* (1) failing to investigate or address HR complaints against Management Staff; (2) ratifying the retaliatory acts of Espinosa's Battalion Chiefs; (3) failing to implement updated resources or technologies for the Department; (4) failing to adequately staff the Department, resulting in excessive overtime hours to Plaintiff Firefighters; (5) refusing to institute internal promotions in a timely manner, thereby failing to establish





BROWN WHITE & OSBORN LLP ATTORNEYS

adequate supervision and leadership in the Department; (6) slashing the battalion chief compensation package and increasing battalion chief minimum education criteria; (7) making untrue and disparaging statements about Plaintiff Firefighters to Chief Lang, encouraging him to have a distrusting and negative view of Plaintiffs; (8) hiring outside candidates for the battalion chief positions; (9) refusing to negotiate in good faith regarding MBFA's labor contract; (10) refusing to take into account the results of the independent salary survey, factfinding report, or petitions signed by Manhattan Beach residents; and (11) imposing the retaliatory terms of the Imposed Contract.

200. The CITY's Imposed Contract deprived STRATTON of seven days of time off, the freedom to attend training on vacation days, and the opportunity to take the Fire Inspector or Fire Marshall position, with its associated increased pay, benefits, and professional development opportunities. Moreover, STRATTON's opportunity for pay raises has been halved as compared to before the Imposed Contract, such that he can expect approximately half of the wage increases of his predecessors for the same years worked. As a result of Defendants' illegal retaliation against Plaintiffs, STRATTON suffered significant economic and non-economic damages, including lost wages, lost overtime pay, lost benefits, lost training classes, lost autonomy over his time off, increased association dues, and lost professional opportunities he would have earned or acquired but for Defendants' unlawful acts.

201. Finally, STRATTON's professional and home life and personal relationships were significantly and adversely impacted by Defendants' unlawful, retaliatory acts. Due to the forced overtime, understaffing, decreased vacation days, limitation on conversion of holiday time, and time-off limitations of the Imposed Contract, STRATTON had to work an excessive number of overtime hours and could not use his vacation time as he wished. As a result, he could not share in the important life events of his family, friends, and community for several years. STRATTON was unable to be as present and active in the lives of his loved ones as he would have been if not for Defendants' retaliatory acts. That time and those moments are irrecoverable.



BROWN WHITE & OSBORN LLP ATTORNEYS

STRATTON would have been much happier with much fewer overtime hours in exchange for a fully staffed Department, fair promotional and hiring practices, reasonable opportunity to take training classes, and more time with his wife, children, and community.

202. Any reasonable employee in STRATTON's position would have found Defendants' adverse employment actions materially adverse in that Defendants' actions would have dissuaded a reasonable employee from engaging in the protected activities at issue. STRATTON suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort due to Defendants' unlawful retaliatory acts.

**N. <u>Defendants' Retaliation Harms Fire Captain STRONG</u>**

203. STRONG has been a Manhattan Beach firefighter, paramedic, and MBFA member since 2002. Defendants retaliated against STRONG for his support for the Vote of No Confidence, his participation in MBFA's political activity, and his own public statements regarding Defendant's mismanagement of the Department.

204. STRONG has been part of MBFA's contract negotiations team in the past heavily contributed to MBFA's campaign to expose Defendants' mismanagement of the Department. For example, he helped design fliers for public distribution, canvassed Manhattan Beach neighborhoods; spoke directly to hundreds of Manhattan Beach residents; passed out fliers, lawn signs, and/or door hangers. Like other Plaintiff Firefighters, STRONG genuinely wanted what was best for the Department in terms of leadership, staffing, resources, and preparedness to do their jobs. He believed his association activities and public statements on the topic of Department management to be constitutionally protected, so he vigorously advocated for change and sought public support for the cause.

205. As a consequence, Defendants unlawfully targeted STRONG and retaliated against him for engaging in association activities and public communications on the topic of Defendants' mismanagement of the Department by, *inter alia,* (1)




BROWN WHITE & OSBORN LLP
ATTORNEYS

repeatedly failing to implement updated resources or technologies for the Department; (4) failing to adequately staff the Department, resulting in excessive overtime hours to Plaintiff Firefighters; (5) refusing to institute internal promotions in a timely manner, thereby failing to establish adequate supervision and leadership in the Department; (6) slashing the battalion chief compensation package and increasing battalion chief minimum education requirements; (7) making untrue and disparaging statements about Plaintiff Firefighters to Chief Lang, encouraging him to have a distrusting and negative view of Plaintiffs; (8) hiring outside candidates for the battalion chief positions; (9) refusing to negotiate in good faith regarding MBFA's labor contract; (10) refusing to take into account the results of the independent salary survey, factfinding report, or petitions signed by Manhattan Beach residents; and (11) imposing the retaliatory terms of the Imposed Contract.

206. Defendants' Imposed Contract deprived STRONG of seven days of time off, the freedom to attend training on vacation days, and the opportunity to take the Fire Inspector or Fire Marshall position, with its associated increased pay, benefits, and professional development opportunities. Moreover, STRONG's opportunity for pay raises has been halved as compared to before the Imposed Contract, such that he can expect approximately half of the wage increases of his predecessors for the same years worked. As a result of Defendants' illegal retaliation against Plaintiffs, STRONG suffered significant economic and non-economic damages, including lost wages, lost overtime pay, lost benefits, lost training classes, lost promotions, lost autonomy over his time off, increased association dues, and lost professional opportunities he would have earned or acquired but for Defendants' unlawful acts.

207. Finally, STRONG's professional and home life and personal relationships were significantly and adversely impacted by Defendants' unlawful, retaliatory acts. Due to the forced overtime, understaffing, decreased vacation days, limitation on conversion of holiday time, and time-off limitations of the Imposed Contract, STRONG had to work an excessive number of overtime hours and could not use his

vacation time as he wished. As a result, he could not share in the important life events of his family, friends, and community for several years. STRONG was unable to be as present and active in the lives of his loved ones as he would have been if not for Defendants' retaliatory acts. That time and those moments are irrecoverable. STRONG would have been much happier with much fewer overtime hours in exchange for a fully staffed Department, fair promotional and hiring practices, reasonable opportunity to take training classes, and more time with his wife, children, and community.

208. Any reasonable employee in STRONG's position would have found Defendants' adverse employment actions materially adverse in that Defendants' actions would have dissuaded a reasonable employee from engaging in the protected activities at issue. Being an active member of MBFA and speaking publicly about Defendants mismanagement of the Department caused STRONG to be targeted. STRONG suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort due to Defendants' unlawful acts.

**O. The City Ratified Defendants' Retaliatory Acts**

209. The CITY continues the retaliation set forth herein. The CITY is aware, and the Firefighters have often informed that CITY, of the conduct described herein above, and has refused to address or ameliorate any of it. The CITY continues to refuse to negotiate fairly with the MBFA, continues to refuse to adequately staff the Department, and continues to impose the punitive, vindictive, and arbitrary retaliatory terms described herein. Plaintiffs continue to suffer damages to this date.

**CLAIM FOR RELIEF**

**(Retaliation Based on Exercise of Right to Free Speech and Association in Violation of 42 U.S.C. § 1983)**

**(Against All Defendants)**

210. Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint, as if fully set forth herein.



BROWN WHITE & OSBORN LLP ATTORNEYS

211. At all times mentioned herein, Plaintiffs' constitutionally and legally protected activities were related to matters of public concern, and were undertaken as private citizens and not pursuant to job duties. Plaintiffs' speech was on matters of public concern because it was relevant to the public's evaluation of the performance of public officials, was relevant to citizens' decisions about the operation of government, and was relevant to residents' understanding of the reliability and capabilities of emergency services in the city. Plaintiffs' right to be free of adverse employment actions taken in retaliation for their union activity, speech on matters of public safety and concern, criticism of the management of the Department, and petition the government was clearly established at all times relevant herein.

212. As a direct result of Plaintiffs' exercising their constitutional rights to speech, expression, assembly, association, and petition for redress of grievances, as well as their right to organize under federal law, Defendants retaliated against Plaintiffs as set forth herein by imposing adverse employment actions on them, including, *inter alia*, adverse employment actions against individual Plaintiff Firefighters, actions intended to reduce the membership and resources of the ASSOCIATION, and actions intended to reduce the pay, benefits, professional development, retirement, and authority of Plaintiff Firefighters. Plaintiffs' exercising their constitutionally and legally protected rights to speak, associate, expression, assembly, petition, and organize was a substantial and motivating factor in Defendants' decision to take adverse employment actions and to enforce the retaliatory Imposed Contract against them, as set forth herein.

213. MOE, JENKINS, DOES 1-10, and Zadroga each acted under color of state law in retaliating against Plaintiffs for their constitutionally protected speech. MOE, JENKINS, and DOES 1-10 acted both individually and as supervisors of other public employees. To the extent they acted as supervisors, MOE, JENKINS, and DOES 1-10 directed subordinates to take the retaliatory acts described herein; set in motion a series of acts by subordinates, and knowingly refused to terminate the series



BROWN WHITE & OSBORN LLP
ATTORNEYS

of acts by subordinates, that they knew or reasonably should have known would cause the subordinates to deprive Plaintiffs of their rights; failed to act to prevent subordinates from doing acts that they knew would violate Plaintiff's rights; and engaged in conduct that showed a reckless or callous indifference to the deprivation of Plaintiffs' rights by subordinates. To the extent MOE, JENKINS, and DOES 1-10 were acting as supervisors, their conduct was so closely related to the deprivation of Plaintiffs' rights as to be the moving force that caused Plaintiffs' ultimate injury.

214. The CITY gave MOE, JENKINS, DOES 1-10, and Zadroga final policymaking authority with respect to the acts described herein, and in doing those acts, they were acting as a final policymakers for the CITY. Their acts as final policymakers were so closely related to the deprivation of the Plaintiffs' rights as to be the moving force that caused the ultimate injury. As final policymakers, they both committed retaliatory acts themselves and ratified retaliatory acts by other CITY employees in that they knew of and specifically made a deliberate choice to approve those employees' retaliatory acts.

215. MOE, JENKINS, DOES 1-10, and Zadroga, in doing the retaliatory acts described herein, where acting pursuant to the CITY's expressly official policy and pursuant to the CITY's longstanding custom and practice. That policy, custom, and practice was so closely related to the deprivation of Plaintiffs' rights to be the moving force that caused the ultimate injury.

216. Defendants' retaliation against Plaintiffs for associating with the ASSOCIATION and exercising their First Amendment rights had a chilling effect upon Plaintiffs' expression activities. Defendants' multiple adverse employment actions were intended to, did, and would chill and deter reasonable employees of ordinary firmness from speaking, associating, or petitioning the government for redress.

217. As a direct result of Defendants' acts and omissions, Plaintiffs suffered significant damages. Plaintiff Firefighters suffered economic damages including lost

wages, lost promotional pay raises and associated benefits, lost overtime pay, reduced retirement benefits, and additional lost pay and benefits that the Plaintiff Firefighters would have earned but for Defendants' adverse employment actions. Plaintiff Firefighters incurred increased ASSOCIATION dues to cover the expenses MBFA incurred as a direct result of Defendants' unlawful acts and omissions.

218. Plaintiff Firefighters also suffered non-economic damages in the form of lost training; lost relationships with other emergency response agencies; lost leadership opportunities; lost shared experiences with their families, friends, and community; decreased autonomy and power over their work and personal lives; and increased psychological and emotional distress, fatigue, exhaustion, and trauma exposure. As a direct, foreseeable and proximate result of Defendants' acts and omissions, Plaintiff Firefighters suffered and continue to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort all to their damage in an amount according to proof at the time of trial, and additional medical expenses, incurred to treat mental and emotional injuries caused by Defendants' retaliation.

219. The ASSOCIATION suffered damages including:

a) expenditures required to defend its members against Defendants' retaliatory actions that otherwise could have been spent on other core purposes;

b) a decrease in its membership caused by Defendants' retaliatory elimination of positions in the Department;

c) lost dues as a result of Defendants' elimination of the paramedic bonuses, thus reducing the resources available to the ASSOCIATION to conduct its core functions;

d) costs and harm when Defendants repeatedly targeted its individual leaders for retaliation, including the baseless and retaliatory disciplinary actions Defendants initiated against MBFA members, thereby distracting the ASSOCIATION from focus on other core functions such as contract negotiation



BROWN WHITE & OSBORN LLP
ATTORNEYS

and forcing the ASSOCIATION to expend resources defending its members against retaliatory investigations;

e) drained resources to participate in repetitive and futile negotiations meetings, hired consultants and factfinders, filed complaints with the PERB, retained attorney(s), and paid for salary surveys and factfinding reports; and

f) reputational damages and loss of public goodwill as a result of the CITY's false or misleading statements alleging that Plaintiff Firefighters are "overpaid," that MBFA was preventing the CITY from hiring more firefighters, that Chief Lang was managing firefighters' time off (and not the Imposed Contract), and MBFA members are not required to request approval for time off, while denying the retaliatory acts the CITY, by and through their employees, agents, and representatives, were engaging in against Plaintiffs.

220. As a direct result of Defendants' acts and omissions, by and through their employees, agents, and representatives, all Plaintiffs incurred legal and professional fees, including attorneys' fees and costs independent from the fees and expenses associated with litigating this case.

221. The Defendants' acts were the actual cause of Plaintiffs' injuries.

222. In performing the acts herein alleged, Defendants acted intentionally to injure Plaintiffs. Their conduct was despicable and was performed with a willful, conscious, and reckless disregard of Plaintiffs' civil rights and with malice, spite, and oppression, such that punitive or exemplary damages are warranted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants for:

1. Compensatory damages, economic and non-economic damages in excess of $5 million, or in an amount according to proof;
2. General damages to compensate Plaintiff Firefighters for mental and emotional injuries, distress, anxiety, and humiliation;



BROWN WHITE & OSBORN LLP
ATTORNEYS

3. Attorneys' fees in an amount according to proof pursuant to 42 U.S.C. § 1988;

4. Exemplary or punitive damages as to Defendants CITY OF MANHATTAN BEACH, BRUCE MOE, and LISA JENKINS, in an amount according to proof that is sufficient to punish and prevent future violations of constitutional rights;

5. Costs of suit; and

6. Such other and further relief as the Court may deem proper.

DATED: May 21, 2024 By ______________________

BROWN WHITE & OSBORN LLP
THOMAS M. BROWN
M. K. GORDON

WERKSMAN JACKSON & QUINN LLP
CALEB E. MASON

Attorneys for Plaintiffs
MANHATTAN BEACH FIREFIGHTERS' ASSOCIATION and individuals THOMAS DESMOND, STEVEN FAIRBROTHER, JAMES FALLS, BRIAN FUJIMOTO, CHRIS GRAFTON, PETER HECK, PATRICK JACOBSON, CHRISTIAN MCARTHUR, RUDY MEJIA, JEFFREY RICE, JAMES STRATTON, and ERICK STRONG

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial.

DATED: May 21, 2024 By ______________________

BROWN WHITE & OSBORN LLP
THOMAS M. BROWN
M. K. GORDON

WERKSMAN JACKSON & QUINN LLP
CALEB E. MASON

Attorneys for Plaintiffs
MANHATTAN BEACH FIREFIGHTERS' ASSOCIATION and individuals THOMAS DESMOND, STEVEN FAIRBROTHER, JAMES FALLS, BRIAN FUJIMOTO, CHRIS GRAFTON, PETER HECK, PATRICK JACOBSON, CHRISTIAN MCARTHUR, RUDY MEJIA, JEFFREY RICE, JAMES STRATTON, and ERICK STRONG